HARTFORD CASUALTY INSURANCE COMPANY *v.*
LYNNE M. FARRISH-LEDUC
(SC 17328)

Borden, Norcott, Katz, Palmer and Vertefeuille, Js.

---

Argued March 11—officially released October 4, 2005

*Jeffrey R. Babbin,* with whom was *Erika L. Amarante,* for the appellant (plaintiff).

*Paul W. Orth,* with whom was *Bruce G. MacDermid,* for the appellee (defendant).

*Opinion*

PALMER, J. In accordance with General Statutes § 52-235[1] and Practice Book § 73-1,[2] the trial court granted the joint motion of the plaintiff, Hartford Casualty Insurance Company, and the defendant, Lynne M.

[1] General Statutes § 52-235 provides: "(a) The Superior Court, or any judge of the court, with the consent of all parties of record, may reserve questions of law for the advice of the Supreme Court or Appellate Court in all cases in which an appeal could lawfully have been taken to said court had judgment been rendered therein.

"(b) The court or judge making the reservation shall, in the judgment, decree or decision made or rendered in such cases, conform to the advice of the Supreme Court or the Appellate Court."

[2] Practice Book § 73-1 provides in relevant part: "(a) Any reservation shall be taken to the supreme court or to the appellate court from those cases in which an appeal could have been taken directly to the supreme court, or to the appellate court, respectively, had judgment been rendered. Reservations in cases where the proper court for the appeal cannot be determined prior to judgment shall be taken directly to the supreme court.

"(b) All questions presented for advice shall be specific and shall be phrased so as to require a Yes or No answer.

"(c) Before any question shall be reserved by any court, counsel shall file in that court a stipulation which shall clearly and fully state the question or questions upon which advice is desired; that their present determination by the appellate court having jurisdiction would be in the interest of simplicity, directness and economy in judicial action, the grounds for such allegation being particularly stated; that the answers to the questions will determine, or are reasonably certain to enter into the final determination of the case; and that the parties request that the questions be reserved for the advice of the appellate court having jurisdiction. The stipulation shall also designate the specific pleadings in the trial court case file which are necessary for the presentation of the question or questions sought to be reserved and shall state the undisputed facts which are essential for determination of the question or questions sought to be reserved. With the stipulation the parties shall file a joint docketing statement in the format specified in Section 63-4 (a) (4) for regular appeals. . . .

"(e) The court will not entertain a reservation for its advice upon questions of law arising in any action unless the question or questions presented are such as are, in the opinion of the court, reasonably certain to enter into the decision of the case, and it appears that their present determination would be in the interest of simplicity, directness and economy of judicial action. . . ."

Farrish-LeDuc, for reservation of a question of law to the Appellate Court. We subsequently transferred the reserved question to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1. The issue framed by the parties and reserved by the trial court for advice is: "[I]s the [plaintiff] insurer . . . [statutorily] entitled . . . to reduce the limits of the uninsured/ underinsured motorist coverage under [the defendant insured's] policy by the $656,581 that [the defendant] received from the professional liability carrier of [a law firm], where that payment was in settlement of [the defendant's] legal malpractice complaint against [the law firm] for damages arising from the dismissal of [the defendant's] time-barred personal injury lawsuit against [a] motorist . . . involved in the [motor vehicle] accident [in which the defendant was injured]?" We answer the reserved question in the affirmative.

The parties have stipulated to the following facts. "On August 7, 1986, the defendant . . . was involved in a four-car accident on Interstate 95 in Norwalk . . . . [The defendant] was the operator of a 1983 Chrysler New Yorker that was struck from behind by a 1983 Toyota Corolla operated by John Costa . . . . Upon impact, [the defendant's] vehicle was pushed into the vehicle in front of her, a 1986 Nissan Sentra operated by Brian K. Givens . . . . Subsequently, a fourth vehicle, a 1981 Mercedes Benz 380 SL driven by John Charles Dunagan . . . came from behind and struck Costa's vehicle.

"At the time of the accident, [the defendant] was insured under a policy issued by the plaintiff . . . . The policy insured two vehicles, [the] 1983 Chrysler New Yorker and a 1983 Plymouth Horizon, with liability limits of $300,000 per accident. The policy also provided uninsured/underinsured motorist coverage up to the sum of the coverage limits stated in the declarations page, or $600,000.

"In June 1988, [the defendant] commenced a lawsuit against Costa and his mother Beverly Costa . . . asserting claims for negligence and recklessness. On September 6, 1990, [the defendant] settled her lawsuit with the Costas for a total payment of $127,835.30. The Costas had a total of $150,000 of insurance coverage available to them. Of that amount, the Costas paid $22,164.70 in settlement of a claim asserted against them by Givens. The payment by the Costas to [the defendant] in the amount of $127,835.30 exhausted the Costas' available insurance policies.

"In July 1989, [the defendant] commenced a lawsuit against Dunagan . . . . In this complaint, [the defendant] alleged that when Dunagan's vehicle negligently hit Costa's car, the impact pushed Costa's vehicle back into [her] vehicle for a second time, causing [her] to sustain further extensive injuries. On August 13, 1993, [the trial court, *Lewis, J.*] granted Dunagan's motion for summary judgment [and rendered judgment in his favor] on statute of limitation[s] grounds, [concluding] that the lawsuit was not commenced within the time provided under General Statutes § 52-584. On October 18, 1994 . . . [the Appellate Court summarily] affirmed [the trial court's] judgment.[3]

"Dunagan had available to him $1 million in motor vehicle liability insurance with respect to the accident at issue . . . .

"In August 1994, [the defendant] commenced a legal malpractice action against the law firm of Levy & Droney, P.C., and a Levy & Droney attorney, Peter Upton, (collectively, 'Levy & Droney') . . . . The [defendant] alleged . . . that Levy & Droney negligently [had] failed to timely commence [the defendant's] lawsuit against Dunagan, thereby preventing [the defendant] from being able to recover damages from Dunagan for

---

[3] *Farrish-LeDuc* v. *Dunagan*, 36 Conn. App. 915, 649 A.2d 261 (1994).

the personal injuries [that] she [had] sustained in connection with the accident. In June, 1998, [the defendant] resolved the legal malpractice claim, obtaining $656,581 in settlement of that lawsuit [which was] paid by the professional liability insurer for Levy & Droney.

"[The defendant] received $5000 of first-party, no-fault, medical benefits under her policy with [the plaintiff] in connection with the accident at issue.

"[Consequently, the defendant] received a total of $789,416.30 in payments from the Costas' motor vehicle insurance carriers, from Levy & Droney's professional liability insurance carrier, and from [the plaintiff's] provision of no-fault benefits.

"[The defendant's] uninsured/underinsured motorist coverage . . . was triggered once [the defendant] had exhausted the Costas' available liability insurance in September, 1990. By letter dated December 28, 1992, [the defendant] submitted to [the plaintiff] a demand for arbitration. The dispute was submitted to a panel of three arbitrators pursuant to the terms of the . . . insurance policy and [what is now] General Statutes § 38a-336 (c).

"In the arbitration, [the plaintiff] contended that the entirety of the $789,416.30 in payments received by [the defendant], including the $656,581 received in settlement of her professional malpractice claim, must be set off from and reduce the policy limit of . . . $600,000 in uninsured/underinsured motorist coverage, resulting in a reduction of coverage to zero dollars. [The defendant] agreed . . . that the $127,835.30 payment from the Costas' insurance carriers reduced the $600,000 limit in uninsured/underinsured motorist coverage . . . . However, [the defendant] disputed . . . [the plaintiff's] contention that her coverage should be further reduced on account of her recovery of $656,581 from Levy & Droney.

"The arbitration panel bifurcated the dispute into two parts: First, the [panel] . . . consider[ed] the question of whether the $600,000 in uninsured/underinsured motorist coverage available under the policy was reduced by the $656,581 in payments received by [the defendant] in settlement of her legal malpractice claim. Second, the [panel] . . . consider[ed] all other issues [necessary to] a final determination of coverage and of the sums that [the defendant] was entitled to recover within the available coverage under the policy. . . .

"[On June 7, 2001] [t]he arbitration panel . . . issued an interim award . . . regarding the coverage available to [the defendant] under the uninsured/underinsured motorist provisions of her policy with [the plaintiff]. On that coverage issue, the [panel] agreed with [the defendant's] position and ruled that the $600,000 policy limit for uninsured/underinsured motorist coverage was reduced by the $127,835.30 payment from the Costas' automobile insurance carriers and was *not* further reduced by the $656,581 payment from Levy & Droney's professional liability carrier. . . .

"On November 18, 2003, the [panel] gave notice . . . of [its] final award . . . . With respect to Costa's status as an underinsured motorist, the panel . . . determined that [the defendant] had, for purposes of triggering the availability of her uninsured/underinsured motorist coverage, exhausted the limits under all bodily injury liability bonds or insurance policies applicable at the time of the accident in question. The panel also determined, as stipulated [to] by the parties, that [the defendant] had sustained damages in excess of $1,250,000 as a result of the accident. The panel quantified the remaining uninsured/underinsured motorist coverage available to [the defendant] under her policy with [the plaintiff] . . . and, based on additional information available to the panel regarding [the plaintiff's $5000] payment of no-fault benefits and [an additional

payment of $2000 that the plaintiff had made to the defendant],[4] issued a net award in the amount of $465,164.70."[5] (Emphasis in original.)

The plaintiff then filed an application to vacate the arbitration award, and the defendant filed a motion to confirm the award. Thereafter, the trial court, *Berger, J.*, granted the parties' joint motion requesting that the court reserve for appellate advice the question of whether the plaintiff was entitled to reduce the limits of the defendant's uninsured/underinsured motorist coverage by the $656,581 that the defendant had received in settlement of her malpractice claim against Levy & Droney for its failure to file a timely action against Dunagan.[6]

We begin our analysis of the reserved question with a review of the applicable statutory and regulatory scheme.[7] Pursuant to General Statutes (Rev. to 1985) § 38-175c (a),[8] which is now codified as amended at

---

[4] The plaintiff had advanced $2000 to the defendant to cover her expenses for mediation that was conducted in connection with the dispute that is the subject of this case.

[5] The panel calculated the net award of $465,164.70 by subtracting from the $600,000 policy limit: (1) the settlement payment from Costas' insurance carriers in the amount of $127,835.30; (2) the plaintiff's payment of $5000 to the defendant for no-fault benefits; and (3) the plaintiff's advance of $2000 to the defendant to cover the cost of mediating the present dispute.

[6] Neither party challenges the arbitration panel's reduction of the limits of the uninsured/underinsured coverage in any other respect.

[7] We note, preliminarily, that, because this case presents a question of law involving an insurance coverage dispute subject to compulsory arbitration, the parties agree that our review of that question is de novo. See, e.g., *Quigley-Dodd* v. *General Accident Ins. Co. of America*, 256 Conn. 225, 234, 772 A.2d 577 (2001).

[8] General Statutes (Rev. to 1985) § 38-175c (a) provides: "(1) Every such policy shall provide insurance, herein called uninsured motorist coverage, in accordance with such regulations, with limits for bodily injury or death not less than those specified in subsection (a) of section 14-112, for the protection of persons insured thereunder who are legally entitled to recover damages from owners or operators of uninsured motor vehicles and underinsured motor vehicles and insured motor vehicles, the insurer of which becomes insolvent prior to payment of such damages, because of bodily injury, including death resulting therefrom, provided each insurer licensed to

General Statutes § 38a-336 (a), all automobile liability policies must provide a minimum level of uninsured motorist coverage for the protection of persons insured thereunder. Under General Statutes (Rev. to 1985) § 38-175c (b) (1), "[a]n insurance company shall be obligated to make payment to its insured up to the limits of the policy's uninsured motorist coverage after the limits of liability under all bodily injury liability bonds or insurance policies applicable at the time of the accident have been exhausted by payment of judgments or settlements, but in no event shall the total amount of recovery

write automobile liability insurance in this state shall provide such uninsured motorists coverage with limits requested by the named insured upon payment of the appropriate premium, but such insurer shall not be required to provide such coverage with limits in excess of the limits of the bodily injury coverage of such policy issued to such named insured. No insurer shall be required to provide uninsured motorist coverage to (A) a named insured or relatives residing in his household when occupying, or struck as a pedestrian by, an uninsured or underinsured motor vehicle or a motorcycle that is owned by the named insured, or (B) to any insured occupying an uninsured or underinsured motor vehicle owned by such insured. Every such policy issued on or after October 1, 1971, which contains a provision for binding arbitration shall include a provision for final determination of insurance coverage in such arbitration proceeding. With respect to any claim submitted to arbitration on or after October 1, 1983, the arbitration proceeding shall be conducted by a single arbitrator if the amount in demand is forty thousand dollars or less or by a panel of three arbitrators if the amount in demand is more than forty thousand dollars.

"(2) Notwithstanding any provision of this section to the contrary, every such policy issued or renewed on and after July 1, 1984, shall provide uninsured motorist coverage with limits for bodily injury and death equal to those purchased to protect against loss resulting from the liability imposed by law unless the insured requests in writing a lesser amount, but not less than the limits specified in subsection (a) of section 14-112. Such written request shall apply to all subsequent renewals unless changed in writing by the insured."

We note that General Statutes (Rev. to 1985) § 38-175, as amended by Public Acts 1985, No. 85-7, and Public Acts 1986, No. 86-403, § 79, was the provision in effect at the time of the accident at issue. The 1985 and 1986 amendments, however, are not relevant to the merits of this appeal. In the interests of simplicity, we refer to the 1985 revision of § 38-175c as the operative statute for purposes of answering the reserved question of law, and all references to § 38-175c throughout this opinion are to that revision.

from all policies, including any amount recovered under the insured's uninsured motorist coverage, exceed the limits of the insured's uninsured motorist coverage."

We have explained that § 38-175c "does not require that [uninsured] motorist coverage be made available when the insured has been otherwise protected . . . . Nor does the statute provide that the [uninsured] motorist coverage shall stand as an independent source of recovery for the insured, or that the coverage limits shall not be reduced under appropriate circumstances. [Rather] [t]he statute merely requires that a certain minimum level of protection be provided for those insured under automobile liability insurance policies; the insurance commissioner [commissioner] has been left with the task of defining those terms and conditions which will suffice to satisfy the requirement of protection." (Internal quotation marks omitted.) *Orkney* v. *Hanover Ins. Co.*, 248 Conn. 195, 205, 727 A.2d 700 (1999).

General Statutes (Rev. to 1985) § 38-175a (a) directs the commissioner to "adopt regulations with respect to minimum provisions to be included in automobile liability insurance policies" and provides that "[s]uch regulations shall relate to the insuring agreements, exclusions, conditions and other terms applicable to the bodily injury liability, property damage liability, medical payments and uninsured motorists coverages . . . ." Pursuant to the authority vested therein, the commissioner promulgated § 38-175a-6 (d) of the Regulations of Connecticut State Agencies,[9] which authorizes an

---

[9] Section 38-175a-6 (d) of the Regulations of Connecticut State Agencies provides: "The limit of the insurer's liability may not be less than the applicable limits for bodily injury liability specified in subsection (a) of section 14-112 of the general statutes, except that the policy may provide for the reduction of limits to the extent that damages have been

"(1) paid by or on behalf of any person responsible for the injury,

"(2) paid or are payable under any workers' compensation or disability benefits law, or

"(3) paid under the policy in settlement of a liability claim. The policy may also provide that any direct indemnity for medical expense paid or

insurer to reduce liability limits "to the extent that damages have been (1) paid by or on behalf of any person responsible for the injury . . . ."[10] In accordance with § 38-175a-6 (d) (1), the policy that the plaintiff issued to the defendant provides that the $600,000 limit of liability for uninsured[11] motorist coverage "shall be reduced by all sums . . . [p]aid because of the bodily injury by or on behalf of persons or organizations who may be legally responsible." The policy also expressly provides that "no one will be entitled to receive duplicate payments for the same elements of loss."

Therefore, the question reserved for our advice, namely, whether the plaintiff may reduce the limits of the defendant's uninsured/underinsured motorist coverage by the $656,581 that the defendant received from Levy & Droney's professional liability insurer in settlement of her malpractice claim, essentially distills to the question of whether that payment constitutes damages "paid by or on behalf of any person responsible for the injury" within the meaning of § 38-175a-6. Regs., Conn. State Agencies § 38-175a-6 (d) (1). If so, the plaintiff is entitled to reduce the limits of the uninsured/underinsured motorist coverage under the defendant's policy by the amount of that settlement payment. We conclude

---

payable under the policy or any amount of any basic reparations benefits paid or payable under the policy will reduce the damages which the insured may recover under this coverage and any payment under these coverages shall reduce the company's obligation under the bodily injury liability coverage to the extent of the payment."

Section 38-175a-6 of the Regulations of Connecticut State Agencies became effective on June 1, 1986, and was transferred to § 38a-334-6 of the Regulations of Connecticut State Agencies in 1992.

[10] Like other regulations promulgated by the commissioner pursuant to § 38-175a (a), § 38-175a-6 has the force and effect of a statute. See, e.g., *Dugas* v. *Lumbermens Mutual Casualty Co.*, 217 Conn. 631, 641, 587 A.2d 415 (1991).

[11] Although the policy at issue refers only to "uninsured" motorist coverage, under its terms, it provided both uninsured and underinsured motorist coverage.

that § 38-175a-6, properly construed in light of its purpose, encompasses that payment.[12]

Our analysis is informed by the nature of the claim from which the payment derived. As a basis for her claim against Levy & Droney, the defendant alleged that, but for the legal malpractice of that firm, she would have recovered damages against Dunagan for the personal injuries that she had sustained as a result of Dunagan's negligence. "Malpractice is commonly defined as the failure of one rendering professional services to exercise that degree of skill and learning commonly applied under all the circumstances in the community by the average prudent reputable member of the profession with the result of injury, loss, or damage to the recipient of those services . . . . In general, the plaintiff in an attorney malpractice action must establish: (1) the existence of an attorney-client relationship; (2) the attorney's wrongful act or omission; (3) causation; and (4) damages." (Citation omitted; internal quotation marks omitted.) *Updike, Kelly & Spellacy, P.C.* v. *Beckett,* 269 Conn. 613, 649, 850 A.2d 145 (2004). When "the underlying action was never tried, the client essentially has a double burden of proof. First, the client must show that the attorney was negligent. Second, the client must establish that the underlying claim was recoverable and collectible." 4 R. Mallen & J. Smith, Legal Malpractice (5th Ed. 2000) § 30.17, p. 495. Thus, in order to prove her claim against Levy & Droney, the defendant would have been required to establish that Levy & Droney's negligent failure to file a timely action against Dunagan caused her harm because her otherwise meri-

---

[12] We note that, under General Statutes § 1-2z, "[t]he meaning of a statute shall, in the first instance, be ascertained from the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered." Neither party contends, however, that § 1-2z governs our review of § 38-175a-6.

torious claim against Dunagan was time barred. Moreover, the damages that the defendant recovered in her action against Levy & Droney are precisely the same as the damages that the defendant would have recovered against Dunagan had Levy & Droney properly pursued the defendant's claim against Dunagan. E.g., *Eastman* v. *Messner*, 188 Ill. 2d 404, 411–12, 721 N.E.2d 1154 (1999) (measure of damages in legal malpractice action is actual amount that client would have recovered in underlying action if malpractice had not occurred); *Bongiorno* v. *Liberty Mutual Ins. Co.*, 417 Mass. 396, 401–402, 630 N.E.2d 274 (1994) (same); *Frazier* v. *New Jersey Manufacturers Ins. Co.*, 142 N.J. 590, 601, 667 A.2d 670 (1995) (same).

In light of these principles, the payments[13] that the defendant received from Levy & Droney's professional liability insurance carrier in settlement of her legal malpractice claim must be deemed the functional equivalent of a payment from Dunagan's insurance carrier. We therefore see no logical reason to treat the payments as distinct for purposes of § 38-175a-6. It is true, of course, that neither Levy & Droney nor its professional liability insurance carrier was responsible for the injuries that the defendant had sustained as a result of Dunagan's negligent operation of his vehicle. Nevertheless, Levy & Droney essentially conceded, by virtue of its settlement payments, that it had caused the economic harm that flowed from the accident. To preclude the plaintiff from reducing the limits of the defendant's uninsured/underinsured motorist coverage by the $656,581 in settlement payments that the defendant had received from Levy & Droney's professional liability insurer would permit the defendant to recover twice for the same element of damages, a result that is at odds with the "time-honored rule that an injured party

---

[13] The defendant received *two* settlement checks totaling $656,581 from Levy & Droney's professional liability insurance carrier.

is entitled to full recovery only once for the harm suffered." (Internal quotation marks omitted.) *Buell* v. *American Universal Ins. Co.*, 224 Conn. 766, 775, 621 A.2d 262 (1993). More fundamentally, it also would be contrary to the underlying purpose of uninsured/underinsured motorist coverage, namely, "to give an insured who is injured in an accident the same resource [that] he would have had if the tortfeasor had carried liability insurance equal to the amount of the insured's [uninsured/underinsured] motorist coverage." *American Motorists Ins. Co.* v. *Gould*, 213 Conn. 625, 632, 569 A.2d 1105 (1990), overruled in part on other grounds by *Covenant Ins. Co.* v. *Coon*, 220 Conn. 30, 594 A.2d 977 (1991).

Our conclusion that the defendant's uninsured/underinsured motorist coverage may be reduced by the amount of her malpractice settlement award is consistent with our interpretation of § 38-175a-6 (d) (1) in cases involving third party settlements. For example, in *Buell* v. *American Universal Ins. Co.*, supra, 224 Conn. 768, the plaintiff, Debra Buell, sustained injuries when the car that she was operating was struck by a second vehicle as a result of another collision between the second vehicle and a third vehicle. An arbitration panel found that the operator of the third vehicle, but not the operator of the second vehicle, was responsible for Buell's injuries. Id., 769. Because the operator of the third vehicle was underinsured, Buell sought underinsured motorist benefits under a liability insurance policy that she had purchased from the defendant, American Universal Insurance Company (American Universal). See id., 769 & n.1. American Universal also insured the operator of the second vehicle and paid $2500 to Buell under the policy issued to the operator of the second vehicle. Id., 768. The arbitration panel awarded Buell underinsured motorist benefits but allowed American Universal to reduce the amount of

benefits by, inter alia, the $2500 payment that Buell had received under the policy issued to the operator of the second vehicle. Id., 769. The trial court determined, contrary to the conclusion of the arbitration panel, that American Universal was not entitled to reduce the amount of benefits by the $2500 payment. Id., 770, 773. American Universal cross appealed, claiming, inter alia, that the trial court improperly had precluded it from deducting the $2500 payment from the total amount that it was obligated to pay Buell under her policy. Id., 773.

On appeal, we concluded that § 38-175a-6 (d) (1), "which permits an insurer to limit its liability by deducting amounts 'paid by or on behalf of any party responsible for the injury,' allows an insurer to deduct a settlement payment from the damages owed to its insured."[14] Id., 775. We predicated our conclusion on the dual legislative intent of providing "a certain minimum level of protection [to underinsured motorists and of] . . . prevent[ing] double recovery on the part of the insured . . . ." Id. We further observed that "[t]o hold otherwise would provide the insured a windfall by permitting duplicate payments for the same injury." Id. As we have indicated, the same reasoning applies with equal force to the present case.

The defendant maintains that our decision in *American Universal Ins. Co.* v. *DelGreco*, 205 Conn. 178, 530 A.2d 171 (1987), compels a contrary conclusion. We disagree. In *DelGreco*, the issue was whether an insurer was allowed to reduce its liability for underinsured motorist coverage by a $20,000 payment that the insured had received pursuant to a restaurant's dram shop insur-

---

[14] In addition, we held in *Lumbermens Mutual Casualty Co.* v. *Huntley*, 223 Conn. 22, 28, 610 A.2d 1292 (1992), that § 38-175a-6 (d) (1) allows an insurer to limit its liability under an underinsured motorist policy by "taking credit for [an underinsured] tortfeasor's personal payment to the insured . . . ."

ance policy. Id., 181–82, 184. In concluding that the insurer could not deduct the $20,000 payment, we observed that § 38-175a-6 (d), "when read in conjunction with the language and intent of § 38-175c, relates only to setoffs of amounts received from other automobile liability policies of those responsible for the injury." (Internal quotation marks omitted.) Id., 197. We further stated that, "[t]o interpret the regulation otherwise would defeat the remedial purpose of underinsured motorist coverage [which is] to protect and [to] make whole a person injured at the hands of an uninsured/ underinsured motorist." Id. Finally, we concluded that a payment under the dram shop statute is not made by or on behalf of "one responsible for the injury"; (internal quotation marks omitted) id., 198; because, under that statute, "[n]o causal relation between the sale [of alcohol] and the injury is required,"[15] and because "a dram shop payment is made on behalf of a liquor establishment which serves alcohol to an intoxicated person who thereafter causes injury to a third party." Id., 199. In the present case, as we explained, there is a causal relationship between the harm sustained and the economic recovery from Levy & Droney.

Moreover, notwithstanding our statement in *DelGreco* limiting setoffs under § 38-175a-6 (d) to "amounts received from other automobile liability policies of those responsible for the injury"; (internal quotation marks omitted) id., 197; in subsequent cases, we have been less stringent in our application of that regulation. See *Buell* v. *American Universal Ins. Co.*, supra, 224 Conn. 775 (permitting setoff of payment by party found not to be responsible for insured's injuries); *Lum-*

---

[15] As we explained in *DelGreco*, a plaintiff seeking to prevail under the dram shop statute must establish that "there was (1) a sale of intoxicating liquor (2) to an intoxicated person (3) who, in consequence of such intoxication, causes injury to the person or property of another." (Internal quotation marks omitted.) *American Universal Ins. Co.* v. *DelGreco*, supra, 205 Conn. 199.

*bermens Mutual Casualty Co.* v. *Huntley*, 223 Conn. 22, 30, 610 A.2d 1292 (1992) (permitting setoff of personal payment by tortfeasor to insured). As we have indicated, the settlement that the defendant had received in the present case was tantamount to a payment made "by or on behalf of" a responsible party because that payment was made to compensate the defendant for her injuries resulting from Dunagan's negligence. Regs., Conn. State Agencies § 38-175a-6 (d) (1). In other words, the settlement was a substitute for the payment that Dunagan's insurer would have been obligated to make to the defendant if Levy & Droney had not negligently failed to obtain a judgment against Dunagan. By contrast, the payment at issue in *DelGreco* was made pursuant to a policy that insured against claims under the dram shop statute, "which creates a form of strict tort liability, [such that] there is no need to establish a causal relation between the sale of liquor and the injury." *Lumbermens Mutual Casualty Co.* v. *Huntley*, supra, 28–29 n.10.

As the plaintiff correctly maintains, the negligence of Levy & Droney in failing to file the defendant's claim against Dunagan in a timely manner merely "shifted the obligation to pay [the defendant's] damages from Dunagan's automobile liability insurance carrier . . . to Levy & Droney's professional liability insurance carrier." In such circumstances, to conclude that the plaintiff is not entitled to offset the defendant's underinsured motorist coverage would be counterintuitive, if not bizarre: under the position advanced by the defendant, she would fare much better as a result of her attorneys' negligence than she would if her claim against Dunagan had been filed in a timely manner and justly resolved. "No apparent justification exists for allowing an injured [motorist] who receives a legal malpractice recovery to be in a better position than an injured [motorist] who recovers directly from the tortfeasor." *Frazier* v.

*New Jersey Manufacturers Ins. Co.*, supra, 142 N.J. 601–602. Because the defendant's malpractice claim against Levy & Droney derived from her personal injury claim against Dunagan, the $656,581 payment made to the defendant by Levy & Droney's professional liability insurer represents the damages that the defendant incurred as a result of Dunagan's negligence. Therefore, § 38-175a-6 (d) (1) must be construed to permit the plaintiff to reduce its liability to the defendant by the amount of that payment.

The reserved question is answered: "Yes."

No costs shall be taxed in this court to either party.

In this opinion the other justices concurred.