******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

SCOTT MENARD *v.* STATE OF CONNECTICUT

DARREN CONNOLLY *v.* STATE
OF CONNECTICUT

ROBERT ZDROJESKI *v.* STATE
OF CONNECTICUT
(AC 42342)

Bright, C. J., and Moll and Bear, Js.

*Syllabus*

The plaintiffs, M and C, Connecticut State Police troopers who suffered
injuries when a motor vehicle driven by a nonparty tortfeasor, B, struck
a police cruiser, sending it into physical contact with them, sought to
recover underinsured motorist benefits allegedly due under insurance
coverage provided by the defendant state of Connecticut, a self-insurer,
pursuant to a collective bargaining agreement. Following a bench trial,
the trial court found, inter alia, that, to the extent B was underinsured,
the state was contractually obligated to provide coverage to the plain-
tiffs, the plaintiffs' claims for damages caused by the alleged post-trau-
matic stress disorder (PTSD) they developed were not compensable
under the underinsured motorist claims statute (§ 38a-336), and it calcu-
lated the plaintiffs' damages. The plaintiffs filed a joint appeal to this
court. The parties then filed a stipulation before the trial court regarding
sums that the plaintiffs had already received, and the court held a hearing
to consider any reductions to the plaintiffs' damages. It concluded that
certain workers' compensation benefits the plaintiffs had received were
deductible from the plaintiffs' damages, but that certain recoveries the
plaintiffs received under the Dram Shop Act (§ 30-102) were not, adjusted
the plaintiffs' damages accordingly, and rendered judgments for the
plaintiffs. The plaintiffs then filed an amended joint appeal, and the
state filed a cross appeal to this court. *Held*:

1. This court concluded that the plaintiffs' original joint appeal was not
taken from final judgments and it must be dismissed for lack of subject
matter jurisdiction, but the plaintiffs' amended joint appeal was jurisdic-
tionally proper; final judgments were not rendered in the trial court
until the court had reduced the plaintiffs' damages to account for certain
sums received by the plaintiffs, which occurred after the original appeal
had been filed; the plaintiffs' amended joint appeal encompassed all of
the claims raised by the plaintiffs in their original joint appeal, and this
court could review all of the plaintiffs' claims in the context of their
amended joint appeal.

2. The trial court properly declined to award the plaintiffs damages related
to their claims of PTSD, as those claims were not compensable under
§ 38a-336: guided by our Supreme Court's decision in *Moore* v. *Continen-
tal Casualty Co.* (252 Conn. 405), in which the term bodily was deter-
mined to relate to something physical and corporeal, as opposed to
purely emotional, this court concluded that bodily injury in § 38a-336
(a) (1) (A) must necessarily be physical in nature, and, under that
interpretation, PTSD, in and of itself as a purely emotional injury, could
not be construed as a "bodily injury" within the purview of § 38a-336;
moreover, guided by the rationale in *Moore*, in which the question was
the legal meaning of "bodily injury" as defined in an insurance policy
and not the medical or scientific question of the degree to which the
mind and the body affect each other, this court was not convinced that
the PTSD purportedly developed by the plaintiffs was transformed into a
"bodily injury" under the statute by virtue of the physical manifestations
accompanying it.

3. The trial court properly reduced the plaintiffs' damages by the sums of
certain workers' compensation benefits they had received, as the statu-
tory and regulatory scheme governing underinsured motorist coverage
in Connecticut did not impose a requirement on a self-insurer to notify
claimants of an election of permissive offsets under the applicable state
regulation (§ 38a-334-6): although, as a self-insurer, the state must main-

tain a preaccident writing reflecting its election of permissive regulatory offsets as mandated by *Piersa* v. *Phoenix Ins. Co.* (273 Conn. 519) and clarified in *Garcia* v. *Bridgeport* (306 Conn. 340), it had no legal obligation to provide its employees with notice of its election to offset its liability for underinsured motorist benefits by the amount of any workers' compensation benefits paid, as our Supreme Court expressly construed § 38a-334-6 of the regulations not to be a notice provision, determining that it served the substantive function of specifying the basic requirement of how an insurer may limit its liability, and the court made no mention of self-insurers providing claimants with copies of such written documents or otherwise notifying claimants of the election of permissive regulatory offsets; accordingly, it was sufficient for the state to maintain a written memorandum containing its election in its files as a public record.

4. The trial court committed error in declining to reduce C's damages by the sums he had recovered pursuant to the Dram Shop Act, as C was being compensated twice for the same injury; the parties stipulated that, among other sums received by C, he recovered certain sums from an establishment under the act as compensatory damages, and, without a reduction of C's damages to account for his dram shop recovery, C was compensated twice for the same injury in violation of the common-law rule precluding double recovery, a legal principle ingrained in this state's underinsured motorist laws.

5. This court concluded that, because neither plaintiff was entitled to recover damages against the state, the trial court, on remand, must render judgments in favor of the state in the plaintiffs' respective cases.

Argued March 9—officially released October 19, 2021

*Procedural History*

Actions to recover underinsured motorist benefits allegedly due under automobile insurance coverage provided by the defendant pursuant to a collective bargaining agreement, brought to the Superior Court in the judicial district of Hartford, where the matters were consolidated and tried to the court, *Shapiro, J.*; decision for the plaintiffs, and the plaintiffs appealed to this court; thereafter, the court, *Hon. Robert B. Shapiro*, judge trial referee, granted in part the defendant's motion for remittitur and a collateral source hearing and rendered judgments for the plaintiffs, from which the plaintiffs filed an amended appeal and the defendant cross appealed to this court; subsequently, the plaintiff Robert Zdrojeski withdrew his appeal. *Appeal dismissed in part; reversed in part; judgments directed.*

*Daniel J. Krisch*, with whom, on the brief, was *Jeffrey L. Ment*, for the appellants-cross appellees (plaintiffs Scott Menard and Darren Connolly).

*David A. Haught*, with whom, on the brief, was *Lorinda S. Coon*, for the appellee-cross appellant (state).

*Opinion*

MOLL, J. In these underinsured motorist matters, the plaintiffs, Scott Menard and Darren Connolly, jointly appeal, and the defendant, the state of Connecticut, cross appeals, from the judgments of the trial court rendered in favor of the plaintiffs following a bench trial. In addition, the state cross appeals from the judgment of the trial court rendered in favor of a third plaintiff, Robert Zdrojeski,[1] after the bench trial. On appeal, the plaintiffs claim that the court improperly (1) declined to award them damages in relation to the post-traumatic stress disorder (PTSD) that they purportedly developed, and (2) reduced their damages by the sums of workers' compensation benefits that they had received. On cross appeal, the state claims that the court improperly declined to reduce the plaintiffs' damages by the sums that they had recovered pursuant to the Connecticut Dram Shop Act (dram shop act), General Statutes § 30-102. We dismiss, sua sponte, the plaintiffs' original joint appeal for lack of a final judgment. See part I of this opinion. As for the amended joint appeal and the cross appeal, we (1) reverse the judgments rendered in favor of the plaintiffs and (2) affirm the judgment rendered in favor of Zdrojeski.[2]

The following facts, as set forth by the trial court, and procedural history are relevant to our resolution of this appeal and this cross appeal. "[O]n September 1, 2012, [Menard, Connolly, and Zdrojeski] were on duty as Connecticut state troopers with the Connecticut State Police. At approximately 1:40 a.m. . . . Connolly was on patrol on Interstate 84 and pulled over a vehicle traveling westbound, due to suspected intoxicated driving, at exit 46 in Hartford, the Sisson Avenue exit. After reaching the bottom of the exit ramp, Connolly parked his [police] cruiser on the right side of the exit, under the directional sign, to the rear of the vehicle, which had stopped before the intersection with Sisson Avenue. The Sisson Avenue exit has four lanes at this point.

"Connolly exited his cruiser to speak with the driver of the vehicle and then returned to his cruiser. . . . Menard drove up to the scene also, parked his police cruiser and also exited to speak with the occupants of the vehicle [that] . . . Connolly had pulled over. Both cruisers had their lights activated.

"Connolly and Menard then began to approach the vehicle. Unbeknownst to Connolly and Menard . . . Zdrojeski also responded to the scene in his police cruiser. He parked his cruiser to the rear and left of Connolly's cruiser, and to the left of Menard's cruiser, in the right center travel lane, also with lights activated. Just after Zdrojeski arrived, another vehicle, driven by nonparty William Bowers, struck Zdrojeski's cruiser from behind, sending Zdrojeski's parked cruiser forward toward Connolly and Menard, where physical con-

tact occurred.

"Menard attempted to jump clear of the cruiser, tumbled in the air, and came down on his head between Zdrojeski's cruiser and the stopped vehicle. Connolly pushed himself away from the cruiser, using his right arm against the hood of the cruiser. At the time of the impact, Zdrojeski had not gotten out of his cruiser. [Menard, Connolly, and Zdrojeski] were ambulatory after the accident and were transported by ambulance to Hartford Hospital."

On June 10, 2014, the plaintiffs commenced separate underinsured motorist actions against the state. In the plaintiffs' respective one count complaints, which were substantively identical, the plaintiffs alleged in relevant part that (1) they sustained injuries from the accident, which occurred as a result of the negligence and/or carelessness of Bowers (nonparty tortfeasor), (2) their personal automobile liability insurance policies and the nonparty tortfeasor's automobile liability insurance policy were insufficient to compensate them in full for their injuries, (3) at the time of the accident, the state carried automobile liability insurance, including underinsured motorist coverage, for their benefit pursuant to a collective bargaining agreement between the state and the state police union, (4) the state was self-insured with respect to its underinsured motorist coverage, (5) pursuant to General Statutes § 38a-336,[3] the state was required to provide them with underinsured motorist coverage, and (6) the state had not disbursed underinsured motorist benefits to them for their injuries.

On January 30, 2017, the state answered the plaintiffs' complaints, admitting that it provides underinsured motorist coverage to state troopers who are parties to the aforementioned collective bargaining agreement, that it is self-insured with respect to that coverage, and that it had not remitted underinsured motorist benefits to the plaintiffs in relation to the accident. The state otherwise denied the plaintiffs' material allegations or left the plaintiffs to their proof. The state also asserted three special defenses. In its first special defense, the state alleged that the plaintiffs' recoveries, if any, were "limited to the $1,000,000 amount of underinsured motorist coverage as set forth in the [state's] [s]elf-[i]nsured [m]otorist [c]overage [f]orm and any other terms and conditions of the [state's] self-insured coverage for the Department of Public Safety." In its second and third special defenses, the state alleged that, in the event that the plaintiffs succeeded on their claims, the state was entitled to certain reductions and setoffs. On January 31, 2017, the plaintiffs filed replies denying the special defenses.

The plaintiffs' respective cases were consolidated for trial and tried to the court, *Shapiro, J.*, over the course of several days in April and May, 2018. At the beginning of the first day of trial, at the parties' joint request, the

court agreed to "focus in this initial stage on the questions of liability and damages without any question of offsets or coverage or collateral sources. And that's similar to the way a lot of cases are presented so we need not consider that. And [the court] understand[s] those issues are for a later day if necessary and that you'll be—if needed, we'll schedule another day for a hearing about those issues and hearing evidence that relates to that or to those things." Following trial, the parties filed posttrial briefs.

On August 24, 2018, the court issued a combined memorandum of decision addressing the plaintiffs' respective cases. With respect to liability, the court determined that (1) the accident was caused by the negligence of the nonparty tortfeasor, (2) the plaintiffs' conduct did not amount to negligence, and (3) to the extent that the nonparty tortfeasor was underinsured, the state was contractually obligated to provide underinsured motorist coverage to the plaintiffs for damages caused by the nonparty tortfeasor. As to damages, the court first rejected a request by the plaintiffs to award them damages stemming from the PTSD that they allegedly developed, determining that (1) the plaintiffs' PTSD claims were not compensable under § 38a-336, and (2) the opinion of the plaintiffs' expert witness, Jennifer Honen, a licensed professional counselor who diagnosed the plaintiffs with PTSD, was not credible.

The court proceeded to calculate the plaintiffs' damages. The court determined that Menard's damages were $171,965.40, consisting of: $43,218.63 in lost wages; $11,839.68 in lost overtime; $56,907.09 in medical expenses; and $60,000 in noneconomic damages. The court calculated Connolly's damages to be $186,738.67, consisting of: $53,144.43 in lost wages; $27,409 in lost overtime; $36,185.24 in medical expenses; and $70,000 in noneconomic damages. In light of the parties' agreement at trial, the court ordered the parties to file a stipulation "account[ing] for items of economic damages which have been paid and for medical expense discounts . . . ." The court further stated that it would render judgments thereafter.

On September 11, 2018, the plaintiffs jointly filed a combined motion to reconsider and for additur, asserting that the court improperly declined to award them PTSD-related damages. On October 1, 2018, the state filed an objection. On November 13, 2018, after hearing argument on October 23, 2018, the court denied the plaintiffs' combined motion. On December 3, 2018, the plaintiffs filed a joint appeal.

On February 13, 2019, the parties filed a stipulation regarding sums that the plaintiffs had received "on account of the personal injuries sustained in the motor vehicle collision of September 1, 2012." As to Menard, the parties stipulated that he had recovered $253,723.30, consisting of: $130,223.63 in workers' compensation

benefits for medical bills, lost wages, and permanent partial disabilities, less $3583.33 that was repaid on a workers' compensation lien; a $10,750 recovery from the nonparty tortfeasor; a $33,000 personal underinsured motorist coverage payment; and an $83,333 dram shop payment.[4] As to Connolly, the parties stipulated that he had recovered $224,532, consisting of: $134,033 in workers' compensation benefits for medical bills, lost wages, and permanent partial disabilities, less $3583 that was repaid on a workers' compensation lien; a $10,750 recovery from the nonparty tortfeasor; and an $83,332 dram shop payment.[5] In addition, the parties represented that they were making no stipulations as to (1) "the state's right of [setoff] under the terms of the underinsured motorist coverage provided to the plaintiffs," (2) whether the stipulated amounts could be set off or credited against the damages awarded by the court, and (3) whether the plaintiffs' dram shop recoveries could be set off against the damages awarded by the court.

On March 6, 2019, the court held a hearing to consider any reductions to the plaintiffs' damages.[6] The parties submitted briefs addressing whether the plaintiffs' damages could be reduced to account for (1) the workers' compensation benefits that the plaintiffs had received, and (2) the plaintiffs' dram shop recoveries.[7] On May 16, 2019, the court issued a combined memorandum of decision concluding that the workers' compensation benefits were deductible from the plaintiffs' damages, but that the dram shop recoveries were not. Taking into account the workers' compensation benefits, along with the additional sums stipulated to by the parties other than the dram shop payments, the court reduced Menard's damages to zero dollars and Connolly's damages to $32,905.67. The court then rendered judgments for the plaintiffs.[8] On May 24, 2019, the plaintiffs filed an amended joint appeal to encompass the judgments rendered by the court following the May 16, 2019 decision. On May 31, 2019, the state filed a cross appeal. Additional facts and procedural history will be set forth as necessary.

I

As a preliminary matter, we address, sua sponte, whether the plaintiffs' original joint appeal, filed on December 3, 2018, was taken from final judgments. "The jurisdiction of the appellate courts is restricted to appeals from judgments that are final. . . . The policy concerns underlying the final judgment rule are to discourage piecemeal appeals and to facilitate the speedy and orderly disposition of cases at the trial court level. . . . The appellate courts have a duty to dismiss, even on [their] own initiative, any appeal that [they lack] jurisdiction to hear. . . . We therefore must always determine the threshold question of whether the appeal is taken from a final judgment before considering the

merits of the claim." (Citations omitted; internal quotation marks omitted.) *Wolfork* v. *Yale Medical Group*, 335 Conn. 448, 459, 239 A.3d 272 (2020). We conclude that the original joint appeal was not taken from final judgments, and, therefore, we lack subject matter jurisdiction to entertain it. We further conclude that the amended joint appeal is jurisdictionally proper and encompasses the claims raised by the plaintiffs in the original joint appeal.

Here, in the August 24, 2018 combined decision, the court determined in relevant part that, insofar as the nonparty tortfeasor was underinsured, the state was contractually required to afford underinsured motorist coverage to the plaintiffs for damages caused by the nonparty tortfeasor. In addition, the court calculated the full amount of damages established by the plaintiffs; however, the court expressly stated that it would render judgments in the plaintiffs' respective cases after the parties had filed a stipulation, in accordance with their agreement at trial, "account[ing] for items of economic damages which have been paid and for medical expenses discounts . . . ." The record reflects that the court rendered judgments in the plaintiffs' respective cases on May 16, 2019, after it had reduced the plaintiffs' damages to account for certain sums received by the plaintiffs. Under these circumstances, we conclude that no appealable final judgments were rendered until May 16, 2019. Accordingly, the original joint appeal, filed on December 3, 2018, was not taken from final judgments and, therefore, must be dismissed for lack of subject matter jurisdiction.

Nevertheless, we may consider all of the plaintiffs' claims in the context of the amended joint appeal, filed on May 24, 2019, which was taken from final judgments. See Practice Book § 61-9 ("[i]f the original appeal is dismissed for lack of jurisdiction, any amended appeal shall remain pending if it was filed from a judgment or order from which an original appeal properly could have been filed"). The amended joint appeal encompasses all of the claims pursued by the plaintiffs in the original joint appeal. Thus, all of the plaintiffs' claims in the context of their amended joint appeal are properly before us for review. See *Featherston* v. *Katchko & Son Construction Services, Inc.*, 201 Conn. App. 774, 783, 244 A.3d 621 (2020), cert. denied, 336 Conn. 923, 246 A.3d 492 (2021), and cases cited therein.

II

Turning to the plaintiffs' amended joint appeal, the plaintiffs claim that the trial court improperly (1) declined to award them PTSD-related damages, and (2) reduced their damages by the sums of the workers' compensation benefits that they had received. We disagree.

A

We first address the plaintiffs' claim that the court improperly declined to award them PTSD-related damages. The dispositive contention raised by the plaintiffs is that the court committed error in concluding that their PTSD claims are not compensable under § 38a-336. We are not persuaded.[9]

The following additional facts and procedural history are relevant to our resolution of this claim. In their respective complaints, the plaintiffs alleged that, as a result of the accident, they sustained physical injuries and PTSD. During trial, in addition to testifying as to the physical injuries that they suffered, the plaintiffs testified as to emotional distress that they experienced following the accident. Menard testified, inter alia, that he had nightmares, intrusive thoughts, difficulty sleeping, and flashbacks of the accident, that he would wake up in cold sweats and "jump out of bed and scream," that he felt hypervigilant, short-tempered, and antisocial, and that he could not stand outside of his patrol car without feeling fearful. Connolly testified, inter alia, that he had irritability, nightmares, difficulty sleeping, and flashbacks of the accident. The plaintiffs' expert witness testified that she treated the plaintiffs following the accident and that it was her opinion that the plaintiffs had developed PTSD stemming from the accident.

In their joint posttrial brief, the plaintiffs both requested damages predicated, in part, on the alleged PTSD that they had developed. In its respective posttrial brief, the state argued that the plaintiffs could not recover damages for PTSD because the coverage that the state afforded them was premised on § 38a-336, which permits recovery for "damages because of bodily injury . . . ." General Statutes § 38a-336 (a) (1) (A). The state posited that the PTSD purportedly developed by the plaintiffs neither constituted a "bodily injury" compensable under the statute nor was derived from a predicate "bodily injury."

In declining to award the plaintiffs PTSD-related damages, the court determined that the terms of § 38a-336 are plain and unambiguous, although the court observed that the statute did not define " 'bodily injury.' " Relying on decisions by our Supreme Court supporting the proposition that "emotional distress, without accompanying physical harm, does not constitute a 'bodily injury,' " the court concluded that the state's coverage, which coincided with § 38a-336, did not encompass the plaintiffs' PTSD claims. The court continued: "Here . . . the plaintiffs' PTSD claims are not a result of their personal injuries. Rather, they are premised on having gone through a life-threatening accident and having to reexperience similar work-related scenarios on a regular basis. Thus, there is no underinsured motorist coverage for these aspects of their claims since they do not constitute 'damages because of bodily injury' [under the statute]."

In their combined motion to reconsider and for additur, the plaintiffs asserted that the PTSD that they allegedly developed was accompanied by physical manifestations, "including sleeplessness, hyper alertness, rapid heart beating, sweating, anxiety, and outbursts of anger," such that the PTSD from which they suffer constitutes a "bodily injury" under § 38a-336 (a) (1) (A). In its objection, the state argued that the PTSD allegedly developed by the plaintiffs was a purely psychological injury and that the court correctly concluded that the statutory term "bodily injury" does not encompass such emotional distress. In denying the plaintiffs' combined motion to reconsider and for additur, the court maintained its reliance on precedent by our Supreme Court, providing that a " 'bodily injury' " does not encompass " 'emotional distress, without accompanying physical harm,' " and declined to consider out-of-state authority presented by the plaintiffs for the first time in their combined motion.

On appeal, the plaintiffs contend that the court's interpretation of § 38a-336 (a) (1) (A) was improperly narrow insofar as the court determined that the PTSD that they allegedly developed did not constitute a "bodily injury" under the statute. The plaintiffs assert that § 38a-336 (a) (1) (A) is ambiguous because there is more than one reasonable reading of the statute vis-à-vis whether PTSD, with accompanying physical manifestations, is encapsulated within the terms of the statute requiring automobile liability insurance policies to provide uninsured and underinsured motorist coverage "for the protection of persons insured thereunder who are *legally entitled to recover damages because of bodily injury* . . . ." (Emphasis added.) General Statutes § 38a-336 (a) (1) (A). This claim is unavailing.

The plaintiffs' claim requires us to construe § 38a-336 (a) (1) (A), which "presents a question of statutory interpretation over which our review is plenary." (Internal quotation marks omitted.) *Reserve Realty, LLC* v. *Windemere Reserve, LLC*, 205 Conn. App. 299, 325, A.3d     (2021). "When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In seeking to determine that meaning, General Statutes § 1-2z[10] directs us first to consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered. . . . In interpreting statutes, words and phrases are to be construed according to their commonly approved usage . . . . Generally, in the absence of statutory definitions, we look to the contemporaneous dictionary definitions of words to ascertain their commonly approved usage." (Citation omitted; footnote

in original; internal quotation marks omitted.) Id.

Section 38a-336 (a) (1) (A) provides: "Each automobile liability insurance policy shall provide insurance, herein called uninsured and underinsured motorist coverage, in accordance with the regulations adopted pursuant to section 38a-334, with limits for bodily injury or death not less than those specified in subsection (a) of section 14-112, for the protection of persons insured thereunder who are legally entitled to recover damages because of bodily injury, including death resulting therefrom, from owners or operators of uninsured motor vehicles and underinsured motor vehicles and insured motor vehicles, the insurer of which becomes insolvent prior to payment of such damages."

The parties do not cite, and our research has not revealed, any appellate case in this state that has interpreted the term "bodily injury" as used in § 38a-336 (a) (1) (A), which is not defined in the statute. We note that § 38a-334-2 (a) of the Regulations of Connecticut State Agencies, promulgated by the insurance commissioner pursuant to General Statutes § 38a-334,[11] defines "[b]odily injury," as used in §§ 38a-334-1 through 38a-334-9 of the regulations, to mean "bodily injury, sickness or disease, including death resulting therefrom . . . ." Section 38a-334-6 (a) of the regulations contains language similar to the statute, providing in relevant part: "The insurer shall undertake to pay on behalf of the insured all sums which the insured shall be legally entitled to recover as damages from the owner or operator of an uninsured or underinsured motor vehicle because of bodily injury sustained by the insured caused by an accident involving the uninsured or underinsured motor vehicle. . . ."

Although neither § 38a-336 (a) (1) (A) nor the regulations shed additional light on the meaning of "bodily injury" in the statute, our Supreme Court has had occasion to consider the ordinary use of the term "bodily." In *Moore* v. *Continental Casualty Co.*, 252 Conn. 405, 746 A.2d 1252 (2000), our Supreme Court concluded that an allegation of emotional distress arising out of economic loss did not trigger an insurer's duty to defend under a homeowners insurance policy providing coverage for "[b]odily [i]njury," which was defined in the policy to mean "bodily harm, sickness or disease . . . ." (Internal quotation marks omitted.) Id., 410. One ground on which the court relied in reaching that conclusion was that "the word bodily as ordinarily used in the English language strongly suggests something physical and corporeal, as opposed to something purely emotional. Webster's Third New International Dictionary confirms this notion, and associates the term bodily with the physical aspects of the human body, and contrasts it with the nonphysical aspects of the human experience such as the mental and spiritual.[12] In the insurance policy, the word bodily is used as an adjective

to modify the terms injury, harm, sickness and disease. Including purely emotional harm arising out of economic loss as a form of bodily injury would be tantamount to defining the term bodily injury with an antonym. At the very least, such a construction would render the term bodily superfluous as an adjective modifying the term injury. It is fair to infer that the use of the term bodily was employed in the policy both accurately and purposefully." (Footnote in original.) Id., 410–11.

We find the application in *Moore* of the ordinary meaning of "bodily" to be persuasive in our construction of § 38a-336 (a) (1) (A). We interpret "bodily" in § 38a-336 (a) (1) (A) to concern "something physical and corporeal, as opposed to something purely emotional." *Moore* v. *Continental Casualty Co.*, supra, 252 Conn. 410. Because "bodily" is used as an adjective to modify "injury," a "bodily injury" under the statute must necessarily be physical in nature. Under this interpretation, PTSD, in and of itself as a purely emotional injury, cannot be construed as a "bodily injury" within the purview of the statute.

The plaintiffs assert that the PTSD that they purportedly developed was accompanied by physical manifestations, such as nightmares and difficulty sleeping, thereby bringing their PTSD claims within the realm of § 38a-336 (a) (1) (A). Our application of *Moore*, however, forecloses this contention. In *Moore*, in rejecting the plaintiff's argument that emotional distress stemming from economic loss fell within the definition of "[b]odily [i]njury" in the homeowners insurance policy, our Supreme Court observed that an "overwhelming majority of jurisdictions" had concluded that, as a matter of law, the term "bodily injury" in a liability insurance policy "does not include emotional distress *unaccompanied by physical harm*." (Emphasis added; internal quotation marks omitted.) *Moore* v. *Continental Casualty Co.*, supra, 252 Conn. 411–12. Notably, the court did not go on to state that emotional distress accompanied by physical symptoms of such distress would constitute a "bodily injury" under such policies. Id., 412–15. In fact, the court expressly disagreed with the rationale of *Voorhees* v. *Preferred Mutual Ins. Co.*, 128 N.J. 165, 607 A.2d 1255 (1992), in which the Supreme Court of New Jersey concluded that the term " 'bodily injury' " in a homeowners insurance policy, defined in the policy to mean " 'bodily harm, sickness or disease,' " "encompasses emotional injuries accompanied by physical manifestations," such as nausea, stomach pains, and headaches. Id., 175, 179; *Moore* v. *Continental Casualty Co.*, supra, 413. Our Supreme Court determined that *Voorhees*, and decisions by other courts having reached similar conclusions, "find ambiguity where there is none, and are contrary to the plain meaning of the language of the insurance policy and the reasonable expectations of the parties to the policy." *Moore* v.

*Continental Casualty Co.*, supra, 414.

Moreover, in rejecting an argument by the plaintiff premised on the proposition that "modern medical science teaches that emotional distress is accompanied by some physical manifestations"; id.; our Supreme Court in *Moore* stated: "It is undoubtedly true that emotional distress ordinarily might be accompanied by some physical manifestations, such as an altered heart rate and altered blood pressure, and perhaps other such manifestations as changes in the size of the pupils, and sleeplessness and headaches. That does not mean, however, that 'bodily harm, sickness or disease,' as used in the insurance policy in this case, necessarily includes emotional distress caused by economic loss. The question in this case is the legal meaning of "'[b]odily [i]njury'" as defined in the policy. It is not the medical or scientific question of the degree to which the mind and the body affect each other." Id., 415; see also *Taylor* v. *Mucci*, 288 Conn. 379, 387, 952 A.2d 776 (2008) (noting that our Supreme Court in *Moore* "rejected the plaintiff's claim that emotional distress fell within the policy's definition of 'bodily harm' because it was accompanied by physical manifestations").

As we determined earlier in this opinion, a "bodily injury" under § 38a-336 (a) (1) (A) must be physical in nature. Guided by our Supreme Court's rationale in *Moore*, we are not convinced that the PTSD purportedly developed by the plaintiffs was transformed into a "bodily injury" under the statute by virtue of the physical manifestations accompanying it.

In their appellate briefs, the plaintiffs also analyze the language immediately preceding "bodily injury" in § 38a-336 (a) (1) (A), providing that uninsured and underinsured motorist coverage is to be provided in each automobile liability insurance policy "for the protection of persons insured thereunder who are *legally entitled to recover damages because of* bodily injury . . . ." (Emphasis added.) General Statutes § 38a-336 (a) (1) (A). We recognize that "[i]t is a basic tenet of statutory construction that the legislature [does] not intend to enact meaningless provisions. . . . [I]n construing statutes, we presume that there is a purpose behind every sentence, clause, or phrase used in an act and that no part of a statute is superfluous. . . . Because [e]very word and phrase [of a statute] is presumed to have meaning . . . [a statute] must be construed, if possible, such that no clause, sentence or word shall be superfluous, void or insignificant." (Internal quotation marks omitted.) *Towing & Recovery Professionals of Connecticut, Inc.* v. *Dept. of Motor Vehicles*, 205 Conn. App. 368, 373–74, 257 A.3d 978 (2021). Read in its entirety, we perceive no reasonable construction of the language in § 38a-336 (a) (1) (A) that alters our conclusion that the plaintiffs' PTSD claims are not compensable under the statute. Cf. *Connecticut*

*Ins. Guaranty Assn.* v. *Fontaine*, 278 Conn. 779, 786–88, 900 A.2d 18 (2006) (concluding that phrase " 'because of bodily injury' " in professional liability insurance policy was ambiguous with respect to whether coverage extended to defendant's loss of consortium claim predicated on husband's bodily injury).

As an aside, we observe that, arguably, the plaintiffs' alleged PTSD could be deemed to be compensable under § 38a-336 (a) (1) (A) if the PTSD stemmed directly from the physical injuries that the plaintiffs sustained from the accident, which unequivocally constitute "bodily injur[ies]" under the statute. As the trial court found, however, "the plaintiffs' PTSD claims are not a result of their personal injuries. Rather, they are premised on having gone through a life-threatening accident and having to reexperience similar work-related scenarios on a regular basis." We do not construe the plaintiffs' claims on appeal as challenging that finding or, in fact, to be asserting that their alleged PTSD resulted from their physical injuries.

In sum, we conclude that the plaintiffs' PTSD claims are not compensable under § 38a-336, and, therefore, the court did not err in declining to award the plaintiffs PTSD-related damages.

B

We next address the plaintiffs' claim that the court improperly reduced their damages by the sums of the workers' compensation benefits that they had received. The plaintiffs contend that the court incorrectly concluded that, pursuant to § 38a-334-6 (d) (1) (B) of the Regulations of Connecticut State Agencies, the state properly had elected to reduce the limits of its uninsured/underinsured motorist coverage by the amount of workers' compensation benefits paid to the plaintiffs, notwithstanding that the state, although maintaining a written document reflecting its election, failed to provide notice of its election to its employees, including the plaintiffs. We reject the plaintiffs' claim of error.[13]

The following additional facts and procedural history are relevant to our resolution of this claim. Prior to the March 6, 2019 hearing, the parties stipulated that (1) Menard had been paid $130,223.63 in workers' compensation benefits, $3583.33 of which had been repaid on a workers' compensation lien, and (2) Connolly had been paid $134,033 in workers' compensation benefits, $3583 of which had been repaid on a workers' compensation lien.

In a separate joint stipulation, filed on February 26, 2019, the parties further stipulated that, at the time of the accident on September 1, 2012, the state maintained a memorandum, dated January 10, 2012, described by the parties as the state's "statement and summary of its auto[mobile] liability insurance coverage, including its self-insured coverage, for the fleet of [s]tate owned

vehicles, as adopted by the State of Connecticut Insurance and Risk Management Board for the policy year [December 31, 2011 through December 31, 2012]" (memo). The memo, a copy of which was appended to the stipulation, provided in relevant part that "[i]t is the intent of the [state] in designing and funding its self-insurance program to avail itself of all rights and benefits conferred to insurers under . . . [§] 38a-336, the applicable Regulations of Connecticut State Agencies, including § 38a-334-6, and the case law interpreting those statutes and regulations. The [s]tate specifically reserves the right to limit its liability pursuant to . . . [§] 38a-334-6 (d) [of the regulations] by reducing the limits of its [uninsured/underinsured motorist] coverage by all sums . . . paid or payable under any workers' compensation law . . . ." The parties also stipulated that the memo "is a public record, created by the [state] Insurance and Risk Management Board and maintained in its insurance/risk management files and created in the ordinary course of business," that the state "does not distribute [the memo] to the [s]tate employees who may operate [s]tate owned vehicles, and that the [s]tate does not distribute [the memo] to the employees' union or union representatives."

In their joint briefs filed in connection with the March 6, 2019 hearing, the plaintiffs argued that the state had not notified its employees, including the plaintiffs, of its election under § 38a-334-6 (d) (1) (B) of the regulations to reduce its underinsured motorist coverage limits by workers' compensation benefits paid or payable to claimants. The plaintiffs posited that, without providing such notice, the state could not avail itself of the permissive offset for workers' compensation benefits authorized under § 38-334-6 (d) (1) (B) of the regulations. In its respective brief, the state argued in relevant part that it maintained the memo, which documented its election of permissive offsets pursuant to § 38-334-6 (d) (1) (B) of the regulations, in accordance with the requirements of *Piersa* v. *Phoenix Ins. Co.*, 273 Conn. 519, 871 A.2d 992 (2005), and that it had no legal obligation to provide notice of said election to the plaintiffs. In concluding that a reduction of the plaintiffs' damages to account for the workers' compensation benefits was appropriate, the court determined that (1) the memo reflected the state's election of permissive offsets under § 38a-334-6 (d) of the regulations, (2) § 38a-334-6 of the regulations does not mandate that a self-insurer must provide notice to claimants of its adoption of permissive regulatory offsets, and (3) no legal authority had been cited requiring the state to distribute the memo to its employees or their union representatives, which, the court observed, was a public record maintained in the state's files, for notification purposes.

The plaintiffs challenge the court's conclusion that the state was entitled, under § 38a-334-6 (d) (1) (B) of the regulations, to offset its liability for uninsured/

underinsured motorist benefits by the amount of the workers' compensation benefits paid to the plaintiffs notwithstanding that the state had failed to provide notice of its election of that permissive regulatory offset. The crux of the plaintiffs' claim is that the state, which is a self-insurer for its underinsured motorist coverage, should not be subject to less stringent requirements than a commercial insurer, which is obligated to include its election of permissive offsets to its underinsured motorist coverage in a written policy provided to its insured. The state argues that, although, as a self-insurer, it must maintain a preaccident writing reflecting its election of permissive regulatory offsets as mandated by *Piersa* v. *Phoenix Ins. Co.*, supra, 273 Conn. 519, it has no legal obligation to provide its employees with notice of said election. We agree with the state.

Our resolution of the plaintiffs' claim requires us to consider whether the statutory and regulatory scheme governing underinsured motorist coverage in Connecticut imposes a requirement on self-insurers to notify claimants of the self-insurers' election of permissive offsets under § 38a-334-6 (d) of the regulations. "The interpretation of statutes and regulations is a question of law over which our review is plenary." *MSW Associates, LLC* v. *Planning & Zoning Dept.*, 202 Conn. App. 707, 726, 246 A.3d 1064, cert. denied, 336 Conn. 946, 251 A.3d 77 (2021).

Section 38a-334 (a) provides in relevant part: "The Insurance Commissioner shall adopt regulations with respect to minimum provisions to be included in automobile liability insurance policies issued after the effective date of such regulations . . . ." Section 38a-336 (a) (1) (A) provides: "Each automobile liability insurance policy shall provide insurance, herein called uninsured and underinsured motorist coverage, in accordance with the regulations adopted pursuant to section 38a-334, with limits for bodily injury or death not less than those specified in subsection (a) of section 14-112, for the protection of persons insured thereunder who are legally entitled to recover damages because of bodily injury, including death resulting therefrom, from owners or operators of uninsured motor vehicles and underinsured motor vehicles and insured motor vehicles, the insurer of which becomes insolvent prior to payment of such damages."

Section 38a-334-6 (a) of the Regulations of Connecticut State Agencies, promulgated by the insurance commissioner pursuant to § 38a-334 (a), provides in relevant part: "The insurer shall undertake to pay on behalf of the insured all sums which the insured shall be legally entitled to recover as damages from the owner or operator of an uninsured or underinsured motor vehicle because of bodily injury sustained by the insured caused by an accident involving the uninsured or underinsured

motor vehicle. . . ." Subsection (d) (1) of § 38a-334-6 of the regulations provides in relevant part: "The limit of the insurer's liability may not be less than the applicable limits for bodily injury liability specified in subsection (a) of section 14-112 of the general statutes, except that the policy may provide for the reduction of limits to the extent that damages have been . . . (B) paid or are payable under any workers' compensation law . . . ."

Section 38a-334-6 (d) (1) of the regulations contemplates the existence of a "policy" reflecting an insurer's election of permissive offsets to its underinsured motorist coverage. " 'Policy' " is defined by statute as "any document, including attached endorsements and riders, purporting to be an enforceable contract, which memorializes in writing some or all of the terms of an insurance contract." General Statutes § 38a-1 (17). As our Supreme Court recognized in *Piersa* v. *Phoenix Ins. Co.*, supra, 273 Conn. 519, "[t]his definition invokes the traditionally understood insurance policy, with the characteristics of an enforceable written contract between insurer and insured, memorializing the terms of that contract. That definition does not fit comfortably within a self-insurance context because in such a context the insurer and insured are one and the same, and there is no enforceable contract between them." Id., 527. Thus, as the court determined in *Piersa*, a self-insurer, such as the state in this case, must satisfy unique conditions in order to take advantage of the permissive offsets authorized by § 38a-334-6 (d) of the regulations. Id.

In *Piersa*, a police officer brought an action against his self-insured municipal employer seeking uninsured motorist benefits. *Piersa* v. *Phoenix Ins. Co.*, 82 Conn. App. 752, 753–54, 848 A.2d 485 (2004), rev'd, 273 Conn. 519, 871 A.2d 992 (2005). The municipality moved for summary judgment, inter alia, on the ground that the police officer had received workers' compensation benefits in excess of its uninsured motorist coverage. Id., 754–55. In objecting to the motion for summary judgment, the police officer argued that the municipality could not limit its coverage by the amount of workers' compensation benefits that he received because it "failed to exercise its permissive right to do so by means of a writing." Id., 755. The trial court rendered summary judgment for the municipality, which this court affirmed. Id., 755, 768.

After granting certiorari, our Supreme Court reversed this court's judgment, construing § 38a-334-6 (d) (1) of the regulations "to require a municipal self-insurer that wishes to impose permitted limits on its obligations as such to do so by a written document that appropriately provides for reduction of limits." *Piersa* v. *Phoenix Ins. Co.*, supra, 273 Conn. 527. In construing § 38a-334-6 of the regulations, the court determined that the regulation "is not . . . a notice provision; it is a provision that

specifies the basic requirement of how an insurer—self or commercial—may limit its liability." Id., 539. Additionally, in describing the parameters of the "written document" alluded to, the court "emphasize[d] that there is no particular form that a self-insured entity must use in order to take advantage of the permitted reductions in limits. The required written document may be part of its written notice to the [insurance] commissioner of its election to be self-insured, pursuant to [General Statutes] § 38a-371 (c)[14] . . . . Or . . . it may be as part of a written document that the self-insured entity maintains in its files. Nor is it necessary for the document to repeat verbatim the language of the regulation that the [self-insurer] intends to adopt as limits on its coverage. . . . [T]he [self-insurer] could adopt those limits by appropriate language indicating incorporation by reference. The purpose of the document is to require the self-insured entity to fulfill its obligation as insurer by providing a kind of rough equivalence to the obligation of a commercial insurer to limit its coverage by appropriate language in its policy of insurance. Any document that reasonably fulfills that purpose will suffice." (Footnote added.) Id., 531.

In a subsequent decision, our Supreme Court further expounded on *Piersa*. In *Garcia* v. *Bridgeport*, 306 Conn. 340, 51 A.3d 1089 (2012), the court considered the issue of whether, without a preaccident writing requesting lesser coverage limits pursuant to § 38a-336 (a) (2),[15] a self-insured municipality was deemed to provide unlimited underinsured motorist coverage. Id., 343. The court held that "a self-insurer is deemed to provide the minimum statutory underinsured motorist coverage" and, thereby, "[a] self-insurer need not prove the existence of a document requesting the minimum statutory coverage limits." Id., 371. In so holding, the court distinguished *Piersa*, observing that the matter before it concerned § 38a-336 (a) (2), "a statutory notice provision requiring an insurer to obtain the informed consent of the insured"; id., 353; whereas *Piersa* addressed § 38a-334-6 of the regulations, which is "not such a notice provision, [but rather] a provision that specifies the basic requirement of how an insurer—self or commercial—may limit its liability." (Internal quotation marks omitted.) Id. The court clarified that it was leaving "undisturbed [its] conclusion in *Piersa* that, to take advantage of permissible offsets provided by § 38a-334-6 (d) of the [regulations], a self-insurer must maintain a written document, either in its files or with the commissioner of insurance." Id., 370.

In a footnote in *Garcia*, our Supreme Court made the following additional observations regarding *Piersa*: "The [municipal] defendant has not asked us to reconsider our holding in *Piersa*. Therefore, although we conclude that the reasoning of *Piersa* cannot be extended to § 38a-336 (a) (2), we leave for another day both reconsideration of the distinction we made in

*Piersa* between that statute and § 38a-334-6 (d) (1) (B) of the [regulations], and the application of our 'rough equivalence' doctrine for self-insurers to justify a prior writing requirement. We note that the 'rough equivalence' achieved by requiring a self-insurer to elect regulatory limits of liability in writing is unlike the other applications of this doctrine that we examine in this opinion. Under *Piersa*, a self-insurer is faced with a pro forma administrative burden, but there is no notice to claimants, such as the plaintiff in this case, and no balancing of cost against benefit by the insured. In the individual commercial insurance context, the policy language requirement serves both as a way for insurers to limit liability and as a way for an insured, as the ultimate potential claimant for uninsured motorist coverage, to provide consent to the cost and benefit trade-off implied by the election of offsets." Id., 358 n.15.

Our Supreme Court's analyses in *Piersa* and *Garcia* are instructive to our resolution of the plaintiffs' claim. Our Supreme Court expressly construed § 38a-334-6 of the regulations *not* to be a notice provision; rather, the court determined that the regulation serves the "substantive function" of "specif[ying] the basic requirement of how an insurer—self or commercial—may limit its liability." (Internal quotation marks omitted.) *Garcia* v. *Bridgeport*, supra, 306 Conn. 361; see also *Piersa* v. *Phoenix Ins. Co.*, supra, 273 Conn. 539. In addition, the court explained that the written document required for a self-insurer to elect a permissive regulatory offset "may be part of [the self-insurer's] written notice to the [insurance] commissioner of its election to be self-insured . . . [o]r . . . it may be as part of a written document that the self-insured entity maintains in its files." *Piersa* v. *Phoenix Ins. Co.*, supra, 531; see also *Garcia* v. *Bridgeport*, supra, 370 ("to take advantage of permissible offsets provided by § 38a-334-6 (d) of the [regulations], a self-insurer must maintain a written document, either in its files or with the commissioner of insurance"). The court made no mention of self-insurers providing claimants with copies of such written documents or otherwise notifying claimants of the election of permissive regulatory offsets. In fact, the court explicitly stated in *Garcia* that "[u]nder *Piersa*, a self-insurer is faced with a pro forma administrative burden, *but there is no notice to claimants . . . .*" (Emphasis added.) *Garcia* v. *Bridgeport*, supra, 358 n.15.

Informed by *Piersa* and *Garcia*, we conclude that, as a matter of law, the state was not required to notify its employees, including the plaintiffs, of its election, pursuant to § 38a-334-6 (d) (1) (B) of the regulations, to offset its liability for uninsured/underinsured motorist coverage by the amount of workers' compensation benefits paid to the plaintiffs in order to avail itself of that permissive regulatory offset. Rather, it was sufficient for the state to maintain the memo, containing said election, in its files as a public record. Accordingly, the

plaintiffs' claim fails.

### III

Turning to the state's cross appeal, the state claims that the trial court committed error in declining to reduce the plaintiffs' damages by the sums that they had recovered pursuant to the dram shop act.[16] Specifically, the state asserts that (1) the court incorrectly construed *American Universal Ins. Co.* v. *DelGreco*, 205 Conn. 178, 530 A.2d 171 (1987), to prohibit the reduction of the plaintiffs' damages to account for their dram shop recoveries, and (2) the court's failure to deduct the plaintiffs' dram shop recoveries from their damages resulted in the plaintiffs being compensated twice for the same injuries in contravention of the common-law prohibition against double recovery. Limiting our analysis to the portion of the state's cross appeal directed to Connolly, we agree.[17]

The following additional facts and procedural history are relevant to our resolution of this claim. Prior to the March 6, 2019 hearing, the parties stipulated that Connolly had received $83,332 from an establishment under the dram shop act. In their principal joint brief filed in connection with the March 6, 2019 hearing, the plaintiffs argued that *DelGreco* prohibited the limitation of an insurer's underinsured motorist coverage to account for sums received by the insured under a dram shop policy. In its respective brief, the state argued in relevant part that Connolly's damages should be reduced by the amount of his dram shop recovery to prevent him from receiving a double recovery. The state further argued that *DelGreco* was inapposite because the insured in that case was not compensated twice for the same injury. In declining to subtract Connolly's dram shop recovery from his damages, the court concluded that it was bound by the holding in *DelGreco* that an insurer's underinsured motorist coverage could not be reduced by sums obtained by the insured under a dram shop policy.

The state contends that the court's reliance on *DelGreco* was misplaced because, unlike the present case, the insured in *DelGreco* did not receive a double recovery. The plaintiffs maintain that *DelGreco* is dispositive of the state's claim. We conclude that *DelGreco* does not govern the precise issue before us.

A brief summary of *DelGreco* is apropos. In *DelGreco*, the decedent died from injuries sustained after being struck by a motor vehicle. *American Universal Ins. Co.* v. *DelGreco*, supra, 205 Conn. 179. The parties stipulated that the decedent's estate sustained damages in excess of $100,000. Id., 180. Following the accident, the estate was paid (1) the $20,000 limit under the tortfeasor's motor vehicle liability policy and (2) the $20,000 limit under the dram shop policy of an establishment against which the estate had pursued a claim under the dram

shop act. Id., 179–80. Thereafter, the estate submitted a claim for underinsured motorist benefits to the decedent's automobile insurer, which had issued a policy to the decedent providing underinsured motorist coverage in the amount of $40,000 per accident and basic reparation benefits in the amount of $5000. Id., 180. The parties stipulated that the insurer was entitled to a credit for (1) the $20,000 liability insurance payment under the tortfeasor's policy and (2) a $2335.80 payment that the insurer had made in basic reparation benefits, but the parties disputed whether the insurer was entitled to a setoff for the $20,000 dram shop payment. Id.

The dispute was submitted to a panel of arbitrators, which entered an award in the estate's favor on the ground that, pursuant to the state statutory and regulatory scheme governing underinsured motorists, the insurer was not entitled to a setoff for the dram shop payment. Id., 181–83. The Superior Court subsequently confirmed the arbitration award. Id., 183. The insurer appealed to this court, and our Supreme Court transferred the appeal to itself. Id., 183–84.

On appeal, our Supreme Court affirmed the Superior Court's judgment. Id., 199. The court first considered the language of General Statutes (Rev. to 1983) § 38-175c (b) (1), as amended by Public Acts 1983, No. 83-267, § 2, and No. 83-461 (now § 38a-336 (b)), which provides in relevant part that "[a]n insurance company shall be obligated to make payment to its insured up to the limits of the policy's uninsured motorist coverage *after the limits of liability under all bodily injury liability bonds or insurance policies applicable at the time of the accident* have been exhausted by payment of judgments or settlements . . . ." (Emphasis added.) *American Universal Ins. Co.* v. *DelGreco*, supra, 205 Conn. 192. The court concluded that dram shop policies did not constitute " 'bodily injury liability bonds or insurance policies' " within the meaning of the statute. Id., 195–96. The court next considered § 38-175a-6 (d) (now § 38a-334-6 (d)) of the Regulations of Connecticut State Agencies, which provides in relevant part that "[t]he limit of the insurer's liability may not be less than the applicable limits for bodily injury liability specified in subsection (a) of section 14-112 of the general statutes, except that the policy may provide for the reduction of limits to the extent that damages have been . . . paid by or on behalf of *any person responsible for the injury* . . . ." (Emphasis added.) *American Universal Ins. Co.* v. *DelGreco*, supra, 182 n.4, 197–98. The court concluded that a dram shop was not an entity " 'responsible for the injury' " under the regulation and that the regulation did not expressly authorize reductions of coverage limits for dram shop payments. Id., 198–99. In sum, the court held that the statute and the regulation "do not allow an insurer to reduce its liability for underinsured motorist coverage by an amount of money received by the insured pursuant to a dram shop policy."

Id., 199.

It is apparent that the issue addressed in *DelGreco* is distinct from the inquiry presently before us. In *DelGreco*, the court concluded that, under the statutory and regulatory scheme governing underinsured motorists in Connecticut, an insurer is not entitled to offset a dram shop payment against the limit of its underinsured motorist coverage. Id. The question in the present case, however, is whether a claimant's damages can be reduced by the sum of a dram shop payment in order to prevent a double recovery as proscribed by common law. *DelGreco* did not contemplate this discrete issue. Indeed, the court in *DelGreco* acknowledged that "the sums due the decedent's estate, even if all were to be collected, [were] far short of the damages suffered," thereby foreclosing the possibility of a double recovery in that case. Id., 198. Thus, the trial court improperly relied on *DelGreco* to determine that the dram shop payment received by Connolly was not deductible from his damages.

Having concluded that *DelGreco* is inapposite, we turn to the state's contention that, without a reduction of Connolly's damages to account for his dram shop recovery, Connolly was compensated twice for the same injury in violation of the common-law rule precluding double recovery. We agree.[18]

Damages recovered under the dram shop act are compensatory. See *Gionfriddo* v. *Gartenhaus Cafe*, 15 Conn. App. 392, 399–400, 546 A.2d 284 (1988), aff'd, 211 Conn. 67, 557 A.2d 540 (1989). Thus, the state's claim requires us to "confront the legal question of whether a plaintiff is entitled to recover compensatory damages twice for the same conduct. Because such a determination involves a question of law, our review is plenary." *Rowe* v. *Goulet*, 89 Conn. App. 836, 848, 875 A.2d 564 (2005).

"[T]he rule precluding double recovery is a simple and time-honored maxim that [a] plaintiff may be compensated only once for his just damages for the same injury. . . . Connecticut courts consistently have upheld and endorsed the principle that a litigant may recover just damages for the same loss only once. The social policy behind this concept is that it is a waste of society's economic resources to do more than compensate an injured party for a loss and, therefore, that the judicial machinery should not be engaged in shifting a loss in order to create such an economic waste." (Internal quotation marks omitted.) *Mahon* v. *B.V. Unitron Mfg.*, *Inc.*, 284 Conn. 645, 663, 935 A.2d 1004 (2007).

The legal principle prohibiting double recovery is ingrained in this state's underinsured motorist laws. Section 38a-336 (b) provides in relevant part that "[a]n insurance company shall be obligated to make payment to its insured up to the limits of the policy's uninsured

and underinsured motorist coverage after the limits of liability under all bodily injury liability bonds or insurance policies applicable at the time of the accident have been exhausted by payment of judgments or settlements, *but in no event shall the total amount of recovery from all policies . . . exceed the limits of the insured's uninsured and underinsured motorist coverage. . . .*" (Emphasis added.) Our Supreme Court has described § 38a-336 (b) as "emphasiz[ing]" the "policy objective of adhering to the time-honored rule that an injured party is entitled to full recovery only once for the harm suffered." (Internal quotation marks omitted.) *Vitti* v. *Allstate Ins. Co.*, 245 Conn. 169, 186 and n.17, 713 A.2d 1269 (1998).

As our Supreme Court has further explained, "[i]t has often been stated that [t]he public policy established by [§ 38a-336] is that every insured is entitled to recover for the damages he or she would have been able to recover if the [under]insured motorist had maintained [an adequate] policy of liability insurance. . . . However, [t]he statute does not require that [under]insured motorist coverage be made available when the insured has been otherwise protected . . . . Nor does the statute provide that the [under]insured motorist coverage shall stand as an independent source of recovery for the insured, or that the coverage limits shall not be reduced under appropriate circumstances. The statute merely requires that a certain minimum level of protection be provided for those insured under automobile liability insurance policies . . . ." (Citations omitted; internal quotation marks omitted.) *Guarino* v. *Allstate Property & Casualty Ins. Co.*, 315 Conn. 249, 255–56, 105 A.3d 878 (2015). Moreover, "General Statutes § 38a-335 (c), which sets forth minimum policy provisions for automobile liability policies, provides in part that '[i]n no event shall any person be entitled to receive duplicate payments for the same element of loss.'" *Fahey* v. *Safeco Ins. Co. of America*, 49 Conn. App. 306, 310, 714 A.2d 686 (1998).

Our Supreme Court's decision in *Gionfriddo* v. *Gartenhaus Cafe*, 211 Conn. 67, 557 A.2d 540 (1989), provides additional guidance. In *Gionfriddo*, the decedent died from injuries sustained in a collision with a motor vehicle operated by an intoxicated driver. Id., 69. The decedent's estate recovered $1,187,763 in compensatory, exemplary, and treble damages in an action filed against the tortfeasor and the lessor of the tortfeasor's motor vehicle. Id. Thereafter, the estate commenced an action against the establishment where the tortfeasor had imbibed alcohol prior to the collision, asserting one claim pursuant to the dram shop act and another claim of wanton and reckless misconduct.[19] Id., 69–70. The establishment moved for summary judgment on those claims, contending that satisfaction of the judgment in the estate's preceding action against the tortfeasor and the lessor for the same injuries precluded the estate's

recovery in the current action. Id., 70. The trial court denied the motion for summary judgment. Id. Following an ensuing jury trial, the jury returned a verdict for the establishment, and the court rendered judgment in its favor. Id. This court affirmed the judgment, although it determined that the trial court had improperly denied the establishment's motion for summary judgment. Id.

After granting certiorari, our Supreme Court affirmed this court's decision, "dispos[ing] of th[e] case by paying heed to the simple and time-honored maxim that [a] plaintiff may be compensated only once for his just damages for the same injury." (Internal quotation marks omitted.) Id., 71. In so ruling, the court observed that (1) the damages claimed by the estate in the dram shop action were identical to those recovered in the preceding action, and (2) the estate never claimed that the verdict for compensatory damages in the preceding action was insufficient. Id., 75–76.

Here, the parties stipulated that, among other sums received by Connolly "on account of the personal injuries sustained in the motor vehicle collision of September 1, 2012," Connolly recovered $83,332 from an establishment under the dram shop act. Without a reduction in his damages accounting for his dram shop recovery, Connolly was compensated twice for the same injury in contravention of the common-law rule precluding double recovery. See also General Statutes § 38a-335 (c).

In sum, the court committed error in declining to reduce Connolly's damages by the sum of his dram shop recovery. Taking into account the $83,332 dram shop payment that Connolly received, the court should have further reduced Connolly's damages from $32,905.67 to zero dollars.

IV

At this juncture, we observe that, as a result of our conclusions in parts II and III of this opinion, neither plaintiff is entitled to recover damages against the state. Under these circumstances, on remand, judgments must be rendered in favor of the state in the plaintiffs' respective cases. See *Fileccia* v. *Nationwide Property & Casualty Ins. Co.*, 92 Conn. App. 481, 496, 886 A.2d 461 (2005) (directing that, on remand, if sum recovered by insured from tortfeasor exceeded insured's damages, then trial court should reduce insured's damages to zero and render judgment in favor of insurer), cert. denied, 277 Conn. 907, 894 A.2d 987 (2006); *Hunte* v. *Amica Mutual Ins. Co.*, 68 Conn. App. 534, 536, 539, 792 A.2d 132 (2002) (concluding that trial court properly rendered judgment for insurer when jury returned verdict for insured in amount less than total of insured's recovery from tortfeasor and insurer's payment of basic reparation benefits); *Fahey* v. *Safeco Ins. Co. of America*, supra, 49 Conn. App. 312 (concluding that

trial court properly rendered judgment for insurer when jury returned verdict for insured in amount less than insured's recovery from tortfeasor). Accordingly, with respect to Menard, in favor of whom the court rendered judgment notwithstanding that his damages had been reduced to zero dollars, we must reverse the judgment and remand the matter with direction to render judgment for the state. Similarly, with respect to Connolly, we must reverse the judgment and remand the matter with direction to render judgment for the state.

The original joint appeal is dismissed for lack of final judgments; as to the amended joint appeal and the cross appeal, the judgments as to Scott Menard and Darren Connolly are reversed and the cases are remanded with direction to render judgments in favor of the state consistent with this opinion, and the judgment as to Robert Zdrojeski is affirmed.

In this opinion the other judges concurred.

[1] This joint appeal, as later amended, was filed by Menard, Connolly, and Zdrojeski, but Zdrojeski subsequently withdrew his portion of the joint appeal and is not participating in the joint appeal or the cross appeal. For the purpose of clarity, we refer in this opinion to Menard, Connolly, and Zdrojeski individually by their surnames, and we refer to Menard and Connolly collectively as the plaintiffs.

[2] As we explain in footnote 17 of this opinion, although the state's cross appeal against Zdrojeski remains pending notwithstanding Zdrojeski's withdrawal of his portion of the joint appeal, as amended, the state has abandoned its claim on cross appeal against Zdrojeski.

[3] Although § 38a-336 has been amended by the legislature since the events underlying the present appeal; see Public Acts 2014, No. 14-20, § 1; Public Acts 2014, No. 14-71, § 1; Public Acts 2015, No. 15-118, § 69; those amendments have no bearing on the merits of this appeal. In the interest of simplicity, we refer to the current revision of the statute.

[4] The record before us does not reflect the policy limits of the nonparty tortfeasor, nor does it reflect the name of the dram shop.

[5] The parties further stipulated that, prior to trial, they had agreed that "the full amount of the [plaintiffs'] medical bills would be allowed into evidence without objection, but that any recovery for said medical bills would be limited to the actual amounts paid, with any adjustments to be handled as a [postjudgment] matter." To that end, the parties stipulated that the difference between Menard's medical expenses and the amount paid in satisfaction thereof by the state's workers' compensation insurance carrier was approximately $33,500, and that the difference between Connolly's medical expenses and the amount paid in satisfaction thereof was approximately $12,633.

[6] The court and the parties referred to the March 6, 2019 hearing as a collateral source hearing, a transcript of which was not ordered by any party in conjunction with this joint appeal, as amended, or this cross appeal. As reflected in its decision issued on May 16, 2019, however, the court reduced the plaintiffs' damages by noncollateral sources. For the sake of clarity, we avoid referring to the March 6, 2019 hearing as a collateral source hearing.

[7] The record before us does not indicate that the plaintiffs objected to the court reducing their damages by the $10,750 payment that each plaintiff received from the nonparty tortfeasor or, in Menard's case, by the $33,000 personal underinsured motorist coverage payment that he received. The plaintiffs do not claim on appeal that the court committed error in deducting those amounts from their damages.

[8] Zdrojeski filed a separate action against the state seeking underinsured motorist benefits, which was consolidated with the plaintiffs' actions for trial. The court rendered judgment in favor of Zdrojeski in the amount of $29,963.03. The judgment rendered for Zdrojeski is not at issue in the joint appeal, as amended. See footnote 1 of this opinion. As for the state's cross appeal, the judgment rendered for Zdrojeski is at issue, but the state has abandoned its claim as to Zdrojeski. See footnote 17 of this opinion.

[9] The plaintiffs also assert that the court erred in discrediting the opinion of their expert witness who diagnosed them with PTSD. In light of our determination that the court properly concluded that the plaintiffs' PTSD claims are not compensable under § 38a-336, we need not reach the merits of this claim of error.

[10] "General Statutes § 1-2z provides: 'The meaning of a statute shall, in the first instance, be ascertained from the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered.' " *Reserve Realty, LLC* v. *Windemere Reserve, LLC*, supra, 205 Conn. App. 325 n.28.

[11] General Statutes § 38a-334 (a) provides in relevant part: "The Insurance Commissioner shall adopt regulations with respect to minimum provisions to be included in automobile liability insurance policies issued after the effective date of such regulations . . . ."

[12] "Webster's Third New International Dictionary defines 'bodily' as 'having a body or a material form: PHYSICAL, CORPOREAL . . . of or relating to the body . . . concerning the body . . . BODILY contrast with *mental* or *spiritual* . . . .' " (Emphasis in original.) *Moore* v. *Continental Casualty Co.*, supra, 252 Conn. 411 n.6.

[13] On the basis of their respective appellate briefs, the parties appear to presume that, as a precondition of the trial court reducing the plaintiffs' damages by the sums of the workers' compensation benefits that the plaintiffs received, the state must have made a proper offset election pursuant to § 38a-334-6 (d) (1) (B) of the Regulations of Connecticut State Agencies. The parties do not address whether § 38a-334-6 (d) (1) (B) concerns only reductions of an insurer's *coverage limits*, as opposed to the *damages* recoverable by the insured, and the implications thereof. Because we reject the merits of the plaintiffs' claim that the state failed to make a proper offset election under § 38a-334-6 (d) (1) (B) of the regulations, we decline to discuss further the scope of the regulation.

[14] General Statutes § 38a-371 (c) provides: "Subject to approval of the Insurance Commissioner the security required by this section, may be provided by self-insurance by filing with the commissioner in satisfactory form: (1) A continuing undertaking by the owner or other appropriate person to perform all obligations imposed by this section; (2) evidence that appropriate provision exists for the prompt and efficient administration of all claims, benefits, and obligations provided by this section; and (3) evidence that reliable financial arrangements, deposits or commitments exist providing assurance for payment of all obligations imposed by this section substantially equivalent to those afforded by a policy of insurance that would comply with this section. A person who provides security under this subsection is a self-insurer. A municipality may provide the security required under this section by filing with the commissioner a notice that it is a self-insurer."

[15] General Statutes § 38a-336 (a) (2) provides in relevant part: "Notwithstanding any provision of this section, each automobile liability insurance policy issued or renewed on and after January 1, 1994, shall provide uninsured and underinsured motorist coverage with limits for bodily injury and death equal to those purchased to protect against loss resulting from the liability imposed by law unless any named insured requests in writing a lesser amount, but not less than the limits specified in subsection (a) of section 14-112. Such written request shall apply to all subsequent renewals of coverage and to all policies or endorsements that extend, change, supersede or replace an existing policy issued to the named insured, unless changed in writing by any named insured. No such written request for a lesser amount shall be effective unless any named insured has signed an informed consent form . . . ."

[16] General Statutes § 30-102 provides in relevant part: "If any person, by such person or such person's agent, sells any alcoholic liquor to an intoxicated person, and such purchaser, in consequence of such intoxication, thereafter injures the person or property of another, such seller shall pay just damages to the person injured, up to the amount of two hundred fifty thousand dollars, or to persons injured in consequence of such intoxication up to an aggregate amount of two hundred fifty thousand dollars, to be recovered in an action under this section . . . ."

[17] In part II B of this opinion, we conclude that the court properly reduced the plaintiffs' damages by the sums of workers' compensation benefits that the plaintiffs had received. Taking into account the workers' compensation benefits, along with the additional sums stipulated to by the parties other

than the dram shop payments, the court reduced Menard's damages to zero dollars and Connolly's damages to $32,905.67. Because Menard's damages cannot be further reduced, we consider only whether the court improperly declined to deduct Connolly's dram shop recovery from his damages.

Additionally, although Zdrojeski has withdrawn his portion of the joint appeal, as amended; see footnote 1 of this opinion; the state has not withdrawn its cross appeal as to Zdrojeski, leaving the cross appeal pending against him. See Practice Book § 61-8 ("[e]xcept where otherwise provided, the filing and form of cross appeals, extensions of time for filing them, and all subsequent proceedings shall be the same as though the cross appeal were an original appeal"); *Schurman* v. *Schurman*, 188 Conn. 268, 270, 449 A.2d 169 (1982) ("withdrawal of an appeal does not preclude continued prosecution of a previously filed cross appeal"). In its appellate briefs, however, the state has briefed its claim on cross appeal only with respect to Menard and Connolly. Thus, we deem the state's claim on cross appeal as to Zdrojeski to be abandoned, and, on that basis, we affirm the judgment rendered in favor of Zdrojeski.

[18] Our conclusion that *DelGreco* is inapposite and that Connolly would obtain an impermissible double recovery without a reduction of his damages by the sum of his dram shop recovery is in accord with commentary in "the leading treatise regarding Connecticut's uninsured [and underinsured] motorist law . . . ." *Vitti* v. *Allstate Ins. Co.*, 245 Conn. 169, 179 n.9, 713 A.2d 1269 (1998); see J. Berk & M. Jainchill, Connecticut Law of Uninsured and Underinsured Motorist Coverage (4th Ed. 2010). In the treatise, the authors observe that, in *DelGreco*, "[t]he claimant . . . was not made 'whole' and, clearly, no 'double recovery' to the estate was present. Although the *limits* of coverage were not reduced (because the dram shop was not deemed to be an 'automobile tortfeasor' under the regulation), it would certainly appear reasonable that the amount of *damages*, if duplicated, should be reduced accordingly." (Emphasis in original.) J. Berk & M. Jainchill, supra, § 4.9.D, p. 464 n.91; see also id., § 6.2, p. 510 n.11 ("The reduction of coverage *limits* and the reduction of *damages* are distinct issues, turning on different concepts. The reduction of coverage limits is unique to the [uninsured/underinsured motorist] context while the reduction of damages to prevent a double recovery is, it is submitted, a universal concept." (Emphasis in original.)); id., 511–12 (observing that, pursuant to *DelGreco*, moneys received from nonautomobile tortfeasor will not reduce insurer's coverage obligation, but that "the damage award should be reduced by such payments to the extent that a 'double recovery' is present").

[19] The estate also asserted negligence and public nuisance claims, but those claims were stricken and judgment was rendered thereon in favor of the establishment. *Gionfriddo* v. *Gartenhaus Cafe*, supra, 211 Conn. 69.