******************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************

# SCOTT MENARD *v.* STATE OF CONNECTICUT

## DARREN CONNOLLY *v.* STATE OF CONNECTICUT
## (SC 20663)

Robinson, C. J., and McDonald, D'Auria,
Mullins and Ecker, Js.

*Syllabus*

The plaintiffs M and C, state police officers who suffered injuries when a motor vehicle driven by a nonparty tortfeasor struck a police cruiser, sought to recover underinsured motorist benefits in connection with certain insurance coverage provided by the self-insured defendant, the state of Connecticut. The plaintiffs' cases were consolidated for a trial to the court, which found for the plaintiffs on the issue of liability but awarded only a fraction of the damages they had sought. The trial court concluded that the plaintiffs were not entitled to damages for their alleged post-traumatic stress disorder (PTSD) on the ground that such damages are not available under the statute (§ 38a-336 (a) (1) (A)) governing uninsured and underinsured motorist coverage and prescribing coverage for damages "because of bodily injury," insofar as the plaintiffs' alleged PTSD was not a result of physical injuries. The trial court also did not credit the expert opinion and testimony of H, the plaintiffs' therapist, that the plaintiffs had suffered from PTSD. Subsequently, the court held a collateral source hearing, after which it concluded that certain workers' compensation benefits that the plaintiffs had received were deductible from the plaintiffs' damages but that certain amounts the plaintiffs had received from a pretrial settlement under the Dram Shop Act (§ 30-102) were not. Accordingly, the court adjusted the plaintiffs' damages and rendered judgments for the plaintiffs. The plaintiffs appealed and the defendant filed a cross appeal. On appeal, the Appellate Court rejected the plaintiffs' claim that the trial court had misconstrued § 38a-336 (a) (1) (A) as limiting underinsured motorist coverage to damages for physical injury and agreed with the defendant that the trial court improperly had failed to reduce the plaintiffs' damages by the amounts of their dram shop recoveries. In light of the Appellate Court's holdings and the fact that the plaintiffs' damages were reduced to zero dollars, the Appellate Court reversed the trial court's judgments and remanded the cases with direction to render judgments for the defendant. On the granting of certification, the plaintiffs appealed to this court. *Held*:

1. The Appellate Court correctly concluded that the plaintiffs were not entitled to recover underinsured motorist benefits for their alleged PTSD:

Even if this court were to conclude that coverage for PTSD was permitted under § 38a-336, expert testimony was required to establish that the plaintiffs suffered from PTSD, and the trial court did not arbitrarily reject the opinion of H, the plaintiffs' only expert witness, regarding the plaintiffs' alleged PTSD in light of H's failure to independently assess the credibility of the plaintiffs' statements to her concerning their claims of emotional distress.

Although it may be standard practice for therapists to presume the truthfulness of their patients' reporting of PTSD symptoms for treatment purposes, the trial court reasonably determined that such an assumption was not sufficient for purposes of a forensic assessment, which is a view shared by some experts in the field, and the cross-examination of H by the defendant's counsel provided further grounds for questioning her assumption that the plaintiffs had honestly and accurately reported their symptoms to her.

Moreover, notwithstanding the plaintiffs' claim that H did not rely exclusively on the plaintiffs' reporting of their symptoms but also on her observations of them during treatment, the trial court reasonably could

have rejected H's testimony that she was able to observe the plaintiffs' reactions while she was treating them and instead have relied on H's session notes, which almost exclusively recounted symptoms as reported by the plaintiffs and in which H recorded few personal observations.

2. The Appellate Court incorrectly concluded that the trial court should have reduced any award by the plaintiffs' dram shop recoveries:

Pretrial settlement payments, such as the sums the plaintiffs received in settlement of their dram shop claims, are deductible from a jury award only if the trial court finds that the award would otherwise be excessive as a matter of law in the absence of such a reduction, and the amounts the trial court awarded the plaintiffs could not be deemed excessive as a matter of law, as the pretrial settlement amounts may have contemplated payment for damages that were not included, or available, in the present action, such as damages for the plaintiffs' alleged PTSD.

Moreover, the defendant could not prevail on its claim that the dram shop payments were collateral sources for which a reduction was appropriate, as settlements expressly have been excluded from the statutory (§ 52-225b) definition of "collateral sources" for purposes of civil actions, either in tort or in contract, in which a plaintiff seeks to recover damages for personal injuries.

Furthermore, although a statute or regulation may provide for a reduction from specific sources in an action seeking to recover uninsured or underinsured motorist benefits, including settlement payments, this court previously has concluded that Dram Shop Act payments do not fall within the exception, set forth in the state regulations (§ 38a-334-6 (d) (1) (A)), for sums "paid by or on behalf of any person responsible for the injury," insofar as a claim under the Dram Shop Act does not require proof that the dram shop was responsible for the injury, and no other statutory or regulatory exception applied under the facts of the present case.

Argued January 12—officially released April 25, 2023

*Procedural History*

Actions to recover underinsured motorist benefits allegedly due under certain automobile insurance coverage provided by the defendant pursuant to a collective bargaining agreement, brought to the Superior Court in the judicial district of Hartford, where the cases were consolidated and tried to the court, *Shapiro, J.*; thereafter, the court, *Hon. Robert B. Shapiro*, judge trial referee, issued a decision, and the plaintiffs appealed to the Appellate Court; subsequently, the court, *Hon. Robert B. Shapiro*, judge trial referee, reduced the plaintiffs' damages and, exercising the powers of the Superior Court, rendered judgments for the plaintiffs, and the plaintiffs filed an amended appeal and the defendant filed a cross appeal with the Appellate Court; thereafter, the Appellate Court, *Bright, C. J.*, and *Moll* and *Bear, Js.*, dismissed the appeal in part, reversed the trial court's judgments as to the plaintiffs and remanded the cases with direction to render judgments for the defendant, and the plaintiffs, on the granting of certification, appealed to this court. *Affirmed in part*; *reversed in part*; *judgment directed in part.*

*Daniel J. Krisch*, with whom was *Jeffrey L. Ment*, for the appellants (plaintiffs).

*David A. Haught*, for the appellee (defendant).

*Ryan K. Sullivan* filed a brief for the Connecticut Trial Lawyers Association as amicus curiae.

*Opinion*

McDONALD, J. This certified appeal raises questions regarding the recovery of underinsured motorist benefits by Connecticut state troopers injured in a motor vehicle accident involving an intoxicated driver. Two of the three plaintiffs in the underlying consolidated cases, Scott Menard and Darren Connolly (plaintiffs), appeal from the Appellate Court's judgment reversing the trial court's judgments in their favor and remanding the cases to the trial court with direction to render judgments for the defendant, the state of Connecticut (state). The third plaintiff, Robert Zdrojeski, withdrew his portion of the joint appeal to the Appellate Court and is not a party to this certified appeal.[1] The plaintiffs contend that the Appellate Court improperly (1) affirmed the trial court's judgments insofar as the trial court concluded that the plaintiffs were not entitled to recover underinsured motorist benefits for alleged post-traumatic stress disorder (PTSD), and (2) reversed the judgments insofar as the trial court determined that the state was not entitled to a reduction in the trial court's awards for sums received by the plaintiffs in settlement of a claim under Connecticut's Dram Shop Act, General Statutes § 30-102. We agree with the Appellate Court's conclusion as to the first issue, although on the basis of a different ground from the one relied on by that court. We disagree with its conclusion as to the second issue. We therefore reverse in part the judgment of the Appellate Court.

The Appellate Court's opinion sets forth the following account of the incident that gave rise to the present cases, as described by the trial court. "[O]n September 1, 2012, [the plaintiffs and Zdrojeski] were on duty as Connecticut state troopers with the Connecticut State Police. At approximately 1:40 a.m. . . . Connolly was on patrol on Interstate 84 and pulled over a vehicle traveling westbound, due to suspected intoxicated driving, at exit 46 in Hartford, the Sisson Avenue exit. After reaching the bottom of the exit ramp, Connolly parked his [police] cruiser on the right side of the exit, under the directional sign, to the rear of the vehicle, which had stopped before the intersection with Sisson Avenue. The Sisson Avenue exit has four lanes at this point.

"Connolly exited his cruiser to speak with the driver of the vehicle and then returned to his cruiser. . . . Menard drove up to the scene also, parked his police cruiser and also exited to speak with the occupants of the vehicle [that] . . . Connolly had pulled over. Both cruisers had their lights activated.

"[The plaintiffs] then began to approach the vehicle. Unbeknownst to [the plaintiffs] . . . Zdrojeski also responded to the scene in his police cruiser. He parked his cruiser to the rear and left of Connolly's cruiser, and to the left of Menard's cruiser, in the right center

travel lane, also with lights activated. [While Zdrojeski was still in his cruiser], another vehicle, driven by nonparty William Bowers, struck Zdrojeski's cruiser from behind, sending Zdrojeski's parked cruiser forward toward [the plaintiffs], [after which] physical contact occurred.

"Menard attempted to jump clear of the cruiser, tumbled in the air, and came down on his head between Zdrojeski's cruiser and the stopped vehicle. Connolly pushed himself away from the cruiser, using his right arm against the hood of the cruiser. . . . [The plaintiffs and Zdrojeski] were ambulatory after the accident and were transported by ambulance to Hartford Hospital." (Internal quotation marks omitted.) *Menard* v. *State*, 208 Conn. App. 303, 306–308, 264 A.3d 1034 (2021).

The record reveals the following additional undisputed facts and procedural history. Menard, Connolly, and Zdrojeski commenced separate underinsured motorist actions against the state. In their complaints, which were largely identical, the plaintiffs alleged in relevant part that (1) they sustained injuries from the accident, which occurred as a result of the negligence and/or carelessness of Bowers (nonparty tortfeasor), who was driving while under the influence of intoxicating liquor, (2) their personal automobile liability insurance policies and the nonparty tortfeasor's automobile liability insurance policy were insufficient to compensate them in full for their injuries, (3) at the time of the accident, the state carried underinsured motorist coverage for their benefit pursuant to a collective bargaining agreement between the state and the Connecticut State Police Union, (4) the state was self-insured with respect to its underinsured motorist coverage, and (5) the state had not disbursed underinsured motorist benefits to them for their injuries.

The plaintiffs further alleged that, as a consequence of the accident, they suffered physical injuries, some permanent, and PTSD. They alleged that these injuries had not only caused pain and suffering for which they had incurred and would incur medical expenses, but also had impaired personal and recreational activities, and had other negative effects.

The state answered the plaintiffs' complaints and asserted special defenses. The state asserted that the plaintiffs' recoveries, if any, were limited to the $1 million amount of underinsured motorist coverage and any other terms and conditions set forth in the state's self-insured motorist coverage form. It also asserted that, in the event that the plaintiffs succeeded on their claims, it was entitled to (1) a reduction for any amount paid to a plaintiff "for bodily injury and lost wages from collateral sources or under any workers' compensation law, disability benefits law or any similar law," and (2) a setoff for any payments made to a plaintiff by, or on behalf of, the nonparty tortfeasor.

The plaintiffs' cases were consolidated for a trial to the court. At the parties' joint request, the trial court agreed that an initial stage of trial would focus exclusively on questions of liability and damages. The court noted that it would deal with any issues related to "offsets or coverage or collateral sources," if necessary, at a later date.

At trial, in addition to presenting medical evidence regarding treatment and assessments of certain permanent impairments, each plaintiff testified regarding the effect that the accident had on him, physically and mentally, and how those effects impacted his ability to participate in activities and to perform his job.[2] Each plaintiff testified about seeking treatment, of varying duration, from a licensed professional counselor, Jennifer Honen, to deal with issues that arose after the accident. Honen, in turn, testified regarding that treatment and attested that she had diagnosed each of the plaintiffs with PTSD.

Following trial, the parties filed briefs. In their joint posttrial brief, the plaintiffs requested $1 million in damages for Menard, approximately $859,000 of which was for noneconomic damages, and approximately $889,000 in damages for Connolly, $750,000 of which was for noneconomic damages.

The trial court thereafter issued a joint memorandum of decision, finding for the plaintiffs on liability but awarding only a fraction of the damages they had sought. This difference evidently was due in large part to the court's rejection of the plaintiffs' claim that they were entitled to damages for PTSD. The court cited two reasons for rejecting the plaintiffs' respective PTSD claims. First, it concluded that PTSD damages are not compensable under the uninsured motorist/underinsured motorist (UM/UIM) statute prescribing coverage for damages "because of *bodily* injury"; (emphasis added) General Statutes § 38a-336 (a) (1) (A);[3] interpreting that term to mean physical injury and its sequelae. The court found that "the plaintiffs' PTSD claims are not a result of their [physical] injuries. Rather, they are premised on having gone through a life-threatening accident and having to reexperience similar work-related scenarios on a regular basis." Second, it did not credit the diagnostic opinion and the testimony of the plaintiffs' expert witness, Honen, that the plaintiffs suffered from PTSD. The court ultimately awarded Menard approximately $172,000, consisting of approximately $112,000 in economic damages (for lost wages, lost overtime, and medical expenses) and $60,000 in unspecified noneconomic damages. The court calculated Connolly's damages to be approximately $187,000, consisting of approximately $117,000 in economic damages and $70,000 in unspecified noneconomic damages.

The plaintiffs jointly filed a motion to reconsider and for additur. They contended that the PTSD that they

developed was accompanied by physical manifestations, "including sleeplessness, hyper alertness, rapid heart beating, sweating, anxiety, and outbursts of anger," such that the PTSD from which they suffer constitutes a "bodily injury" under § 38a-336 (a) (1) (A). The state argued, in opposition, that the PTSD allegedly developed by the plaintiffs was a "purely psychological injury" and that the trial court correctly concluded that the statutory term "bodily injury" does not encompass such emotional distress. The court denied the plaintiffs' motion without addressing the distinction raised by the parties. The plaintiffs then filed a joint appeal with the Appellate Court, challenging the trial court's conclusion that they were not entitled to recover damages for PTSD.

While that appeal was pending, the trial court took up the state's motion for a collateral source hearing. The parties submitted a stipulation of facts, setting forth all sums that each plaintiff had received on account of the personal injuries sustained in the motor vehicle collision. Those included workers' compensation benefits for medical bills, lost wages, and permanent partial disabilities; recovery from the nonparty tortfeasor; personal underinsured motorist coverage payments; and a dram shop payment in the amount of approximately $83,333.[4] The stipulation made clear that the parties were not stipulating as to the state's right to any setoff or reduction by acknowledging these sums.

The parties' disagreement focused on sums that the plaintiffs had received from two sources: payments under workers' compensation law and the dram shop settlement payments. The trial court determined that the workers' compensation benefits were deductible from the plaintiffs' damages but that the dram shop recoveries were not. In reaching the latter conclusion, the trial court reasoned that it was bound by *American Universal Ins. Co.* v. *DelGreco*, 205 Conn. 178, 530 A.2d 171 (1987), in which this court had stated that the statutory and regulatory scheme governing underinsured motorist coverage "do[es] not allow an insurer to reduce its liability for underinsured motorist coverage by an amount of money received by the insured pursuant to a dram shop policy." Id., 199. After taking into account the workers' compensation benefits, along with the additional sums stipulated to by the parties other than the dram shop payments, the trial court reduced Menard's damages to zero dollars and Connolly's damages to $32,905.67. The court then rendered judgments for the plaintiffs in accordance with that determination.

The plaintiffs filed an amended joint appeal to include a challenge to the trial court's reduction of the damages award by the workers' compensation benefits that the plaintiffs had received. The state filed a cross appeal, challenging the trial court's denial of the state's claim that it was entitled to a reduction to account for the

dram shop payments.

The Appellate Court rejected the claims raised in the plaintiffs' amended appeal. See *Menard* v. *State*, supra, 208 Conn. App. 314–32. Of relevance to the present appeal, the Appellate Court disagreed that the trial court had misconstrued § 38a-336 (a) (1) (A) to limit UM/UIM coverage to damages for physical injury. See id., 319–20. The Appellate Court rejected the notion that it was material whether the plaintiffs' alleged PTSD, which was not caused by physical injuries sustained in the collision, had accompanying physical manifestations. See id., 320–23. In light of its conclusion that there was no coverage for the plaintiffs' PTSD claims under the statute, the Appellate Court declined to reach the plaintiffs' claim that the trial court had erred in failing to credit the opinion of Honen, who diagnosed them with PTSD. Id., 314 n.9.

The Appellate Court agreed with the claim raised by the state in its cross appeal. Id., 332–33. Specifically, it agreed that the trial court's failure to reduce the plaintiffs' damages by their dram shop recovery violated the common-law rule against double recovery. See id., 333; see also id., 337 (citing "[the] simple and time-honored maxim that [a] plaintiff may be compensated only once for his just damages for the same injury" (internal quotation marks omitted)). The Appellate Court surveyed case law that had applied or recognized the common-law rule in the context of automobile liability policies, as well as case law recognizing the limited purpose of UM/UIM coverage. See id., 338–40. It determined that the trial court had failed to recognize that the concern underlying the common-law rule was not implicated in *DelGreco*, in which this court held that dram shop payments were not deductible under the UM/UIM statute and regulation, because the plaintiffs' recovery in *DelGreco* fell short of their actual damages. See id., 335–36. Because the trial court had already reduced Menard's damages to zero dollars, the Appellate Court limited its application of the common-law rule to Connolly. See id., 333 n.17. It reduced Connolly's damages by his dram shop payment, which also left Connolly with zero dollars in damages. Id., 340. In accordance with these determinations, the Appellate Court reversed the judgments in favor of the plaintiffs and remanded the cases to the trial court with direction to render judgments for the state in those cases.[5] Id., 341.

This court granted the plaintiffs' request for certification to appeal, limited to the following issues: (1) whether the Appellate Court correctly determined that the plaintiffs' PTSD with physical manifestations is not a compensable bodily injury under § 38a-336 (a) (1) (A), and (2) whether the Appellate Court correctly determined that the common-law rule precluding double recovery required that the underinsured motorist damages awarded to Connolly be reduced by the amount

that a third party paid to him in settlement of a Dram Shop Act claim. *Menard* v. *State*, 340 Conn. 916, 916–17, 266 A.3d 886 (2021). In its brief to this court, the state asserts an alternative ground for affirmance on the first issue. Specifically, the state contends that, even if this court were to agree with the plaintiffs' interpretation of § 38a-336, the plaintiffs could not prevail because they failed to prove that they had PTSD given the trial court's rejection of the opinion of their expert.

We conclude that the plaintiffs' liability claim fails on grounds of evidentiary insufficiency and, therefore, decline to reach the broader legal question as to whether the UM/UIM statute affords coverage for PTSD, if accompanied by physical manifestations.[6] We also conclude, however, that the plaintiffs' damages should not have been reduced by the sum of the plaintiffs' pretrial dram shop settlement payments.

I

We begin with the plaintiffs' contention that the trial court erroneously concluded that neither Honen's testimony nor her diagnosis of PTSD was credible. The plaintiffs submit that the court's rejection of Honen's expert opinion was impermissibly arbitrary because the opinion was unrebutted and supported by the record. We disagree.

The record reveals the following additional facts. On direct examination, Honen testified that she holds a master's degree in counseling psychology, is a licensed professional counselor, specializes in trauma issues in her private practice, and is certified in "EMDR, which is eye movement desensitization and reprocessing . . . an evidence-based psychotherapy modality used specifically for trauma and PTSD, and other anxiety disorders . . . ." She explained that PTSD is defined in the current edition of the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders by eight criteria. See American Psychiatric Assn., Diagnostic and Statistical Manual of Mental Disorders (5th Ed. 2013) pp. 271–72 (DSM-5). She testified that she had treated the plaintiffs and Zdrojeski, for varying periods, and had diagnosed all three with PTSD because they met all of the DSM-5 criteria. She noted that they had complained of multiple symptoms that were consistent with PTSD following a stressor event, such as hypervigilance, flashbacks, and negative alterations in mood. When asked why the plaintiffs and Zdrojeski, whose jobs had previously exposed them to all sorts of dangerous situations, would sustain PTSD as a result of this particular incident, Honen explained: "[W]hen someone has repeated trauma, trauma upon trauma, we kind of have this bucket, and we're okay, as long as the trauma stays in the bucket. But each trauma adds another drop in the bucket, and, truthfully, once you're at the top of a bucket, the next drop can be small; it doesn't matter, right? It will overflow . . . . [Y]our brain and nervous

system can only take so much before something tips it over."

On cross-examination, Honen admitted that she had not reviewed any outside sources to confirm the plaintiffs' and Zdrojeski's accounts of the incident and, thus, was unaware, for example, that Connolly was not factually accurate in reporting to her that he had been "run over . . . ." The state's counsel also questioned the likelihood that the plaintiffs and Zdrojeski had all sustained PTSD from the same accident, despite their varied experience both before and during the incident.

After the state's counsel concluded his initial cross-examination of Honen, the following exchange ensued:

"The Court: I have a question. In your practice, how do you discern whether . . . someone who comes to you is dissembling?

"[Honen]: Dissembling?

"The Court: Lying.

"[Honen]: Uh-huh. I think for me, in my practice, and most of us, is that, if we don't have any reason to believe they're lying, if nothing jumps out as a reason to believe they're lying, then we believe that they're telling us their perception of what occurred.

"I'd be looking more for something that seems odd in their—in their personality or character strategy or different—a specific type of way that they interact with me or with other people, different reports of, you know, like stormy and short relationships, and different things that I would look at, in terms of like a, you know, kind of a more characterological disorder.

"But if there's—so, it's more, like, if none of those flags goes up, we're kind of in the position of believing our clients. The criteria help us stay to things that are more, kind of, scientific. . . .

\* \* \*

"[The State's Counsel]: There are standard tests in the field for what they call 'malingering.'

"[Honen]: Yes.

"[The State's Counsel]: You don't do any of those diagnostic tests?

"[Honen]: I'm not a psychologist. Mostly psychologists do those tests.

\* \* \*

"[The Plaintiffs' Counsel]: Did you have any indication that something wasn't adding up when you talked to any of the three troopers?

"[Honen]: None whatsoever.

"[The Plaintiffs' Counsel]: Did you have any doubt in the sincerity and [honesty] that they told you?

"[Honen]: No, I did not."

In its memorandum of decision, the trial court stated: "[T]he three [troopers] rely on the diagnosis of their therapist, [Honen], that each met the criteria for having PTSD. In her testimony, Honen acknowledged that she did no screening to assess the validity of their statements concerning their claims of emotional distress. Rather, she accepted their statements without making an independent assessment. The court does not credit her testimony or her diagnosis."

The plaintiffs appear to concede that expert testimony was required to prove that they suffered from PTSD. See, e.g., *Osborn* v. *Waterbury*, 333 Conn. 816, 826, 220 A.3d 1 (2019) ("[e]xpert testimony is required when the question involved goes beyond the field of the ordinary knowledge and experience of judges or jurors" (internal quotation marks omitted)). Our review of the trial court's rejection of Honen's testimony, therefore, is governed by settled principles. This court has recently reiterated the proposition that a trier of fact may accept or reject, in whole or in part, the testimony of an expert offered by one party. See *State* v. *LeRoya M.*, 340 Conn. 590, 612–13, 264 A.3d 983 (2021); *State* v. *Weathers*, 339 Conn. 187, 210–11, 260 A.3d 440 (2021). This principle holds true even when the opposing party offers no rebuttal expert. See, e.g., *State* v. *LeRoya M.*, supra, 613; see also, e.g., *Goldstar Medical Services, Inc.* v. *Dept. of Social Services*, 288 Conn. 790, 831, 955 A.2d 15 (2008). "[I]n its consideration of the testimony of an expert witness, the [trier of fact] might weigh, as it sees fit, the expert's expertise, his opportunity to observe the [person being examined] and to form an opinion, and his thoroughness. It might consider also the reasonableness of his judgments about the underlying facts and of the conclusions [that] he drew from them." (Internal quotation marks omitted.) *State* v. *Weathers*, supra, 210–11. Thus, it is permissible for the trier of fact to entirely reject uncontradicted expert testimony as not worthy of belief. Id., 211.

We have also recognized, however, that the trier's discretion is not without limits. "[T]he trier's freedom to discount or reject expert testimony does not . . . allow it to arbitrarily disregard, disbelieve or reject an expert's testimony in the first instance. . . . [When] the [trier] rejects the testimony of [an] . . . expert, there must be some basis in the record to support the conclusion that the evidence of the [expert witness] is unworthy of belief. . . . That said, given the myriad bases on which the trier properly may reject expert testimony and the reviewing court's obligation to construe all of the evidence in the light most favorable to sustaining the trier's [finding or] verdict, it would be the rare case in which the reviewing court could conclude that the trier's rejection of the expert testimony was arbitrary." (Citation omitted; emphasis omitted;

internal quotation marks omitted.) *State* v. *LeRoya M.*, supra, 340 Conn. 613–14.

The record in the present case clearly demonstrates that the trial court's rejection of Honen's opinion was not arbitrary. The court provided a specific reason why it rejected her testimony, namely, Honen's failure to independently assess the credibility of the plaintiffs' reports. Honen acknowledged that tests for malingering exist and that they are applied by psychologists. She admitted that she assumed that the plaintiffs' descriptions of their symptoms were truthful. Honen did not testify that there were any particular factors that weighed against concluding that the plaintiffs were malingering, only that malingering would be considered if there were red "flags . . . ." See, e.g., 2 B. Stern & J. Brown, Litigating Brain Injuries (2006) § 14:18, pp. 14-59 through 14-60 (noting that authors of seminal article on malingered post-traumatic symptoms have presented eleven factors suggesting malingering of psychological distress after trauma).

It may well be standard practice for therapists to presume the truthfulness of their patients' reporting of PTSD symptoms for treatment purposes. The trial court did not act arbitrarily, however, by concluding that such an assumption is not sufficient for purposes of a forensic assessment, a view shared by some experts in the field. See, e.g., American Psychiatric Assn., Diagnostic and Statistical Manual of Mental Disorders (4th Ed. Text Rev. 2000) p. 467; S. Rubenzer, "Personal Injury Settings: Malingering Psychiatric Disorders and Cognitive Impairment," 47 For the Defense, no. 4, April, 2005, pp. 18–25, 67; see also, e.g., D. Smith, "Diagnosing Liability: The Legal History of Posttraumatic Stress Disorder," 84 Temp. L. Rev. 1, 55 (2011) (citing concern among some members of psychiatric community, relating to PTSD diagnosis, "about the heavy reliance during the diagnostic process on subjective reporting by the patient of both the stressor event and the resulting reactions, as well as the subjective impressions of the diagnostician"). But see, e.g., *Cooper* v. *Carl A. Nelson & Co.*, 211 F.3d 1008, 1020–21 (7th Cir. 2000) ("[I]n clinical medicine, the methodology of physical examination and self-reported medical history . . . is generally appropriate. . . . [T]he accuracy and truthfulness of the underlying medical history is subject to meaningful exploration on cross-examination and ultimately to jury evaluation." (Citations omitted.)).

The plaintiffs contend that Honen did not rely exclusively on the plaintiffs' reporting of their conditions but also on her observations of them during treatment. The trial court reasonably could have relied on Honen's session notes, however, which indicate that Honen diagnosed the plaintiffs and Zdrojeski with PTSD, or determined that the protocol for treating PTSD should be followed, after their initial evaluations. Her notes from

subsequent treatment sessions almost exclusively recounted symptoms as reported by the plaintiffs; few observations were recorded. Although Honen did testify that she was able to observe the plaintiffs' reactions while she was treating them, the trial court was not required to credit that testimony.[7]

The cross-examination of Honen also provided fodder for questioning her assumption that the plaintiffs were honestly and accurately reporting their symptoms. The state's counsel repeatedly underscored the unlikelihood that, just prior to this accident, the plaintiffs and Zdrojeski each had reached their maximum capacity for processing trauma and that this incident, which each trooper experienced differently, was the tipping point, causing each to suffer PTSD. Counsel pointed out Honen's unawareness of inconsistencies between the plaintiffs' reporting of the circumstances of the accident and the actual facts. Honen also acknowledged that her notes reflected that the plaintiffs, during their treatment, were involved in pending litigation to recover for their injuries.[8]

The record in the present case demonstrates that the trial court's rejection of Honen's testimony was not impermissibly arbitrary. Therefore, in the absence of credible expert testimony, the plaintiffs cannot recover damages for PTSD, even if coverage was afforded for such an injury under the UM/UIM statutory scheme and the state's UM/UIM policy.

## II

We next turn to the plaintiffs' claim that the Appellate Court incorrectly concluded that the trial court should have reduced their award by the sums received in settlement of their dram shop claims. They contend that such payments are not deductible, either as a consequence of the common-law rule against double recovery or under the UM/UIM scheme. The state contends that the dram shop payments must be deducted, either under the common-law rule or as a collateral source. In light of our conclusion in part I of this opinion, which leaves Menard's recovery at zero dollars, we note that this issue only affects Connolly. We agree with the plaintiffs.

We begin by underscoring that it is undisputed that the reduction was sought not for sums awarded following a final judgment in a fully litigated case, but for sums obtained by pretrial settlement. This court has repeatedly recognized that the legislature abrogated the common-law rule with respect to pretrial settlement payments when it adopted General Statutes § 52-216a. See, e.g., *Mahon* v. *B.V. Unitron Mfg., Inc.*, 284 Conn. 645, 663–65, 935 A.2d 1004 (2007); *Bovat* v. *Waterbury*, 258 Conn. 574, 598–99, 783 A.2d 1001 (2001); *Peck* v. *Jacquemin*, 196 Conn. 53, 70–72, 491 A.2d 1043 (1985); *Seals* v. *Hickey*, 186 Conn. 337, 346, 441 A.2d 604 (1982). A jury award may be reduced by amounts obtained

pursuant to such settlements only by way of a trial court's order of remittitur, which is available only if the court "determine[s] that the settlement payments, when added to the jury award, render that award excessive as a matter of law, a threshold that is met only when the total amount received so far exceeds what is fair and reasonable as to be unconscionable." *Mahon* v. *B.V. Unitron Mfg., Inc.*, supra, 665; see also *Imbrogno* v. *Chamberlin*, 89 F.3d 87, 90 (2d Cir. 1996) (trial court may reduce jury verdict under § 52-216a by amount plaintiff received in settlement only if jury award is excessive when considered in light of amount of settlement payment).

Although liability in the present case was determined by the court in a bench trial, not by a jury, the same principles apply. We recently acknowledged that § 52-216a allows the trial court to consider a settlement payment in a bench trial and that such consideration might prevent double recovery. See *Caverly* v. *State*, 342 Conn. 226, 237–39, 269 A.3d 94 (2022). We also explained, however, that the use of this evidence should not result in any substantive difference from what would be permitted in a jury trial. See id., 239 n.12, citing *Peck* v. *Jacquemin*, supra, 196 Conn. 73. In other words, the trial court may reduce the damages to account for pretrial settlement payments, whether in a trial to the jury or to the court, when the award would otherwise be excessive as a matter of law in the absence of such a reduction.

In contemplating what it means for the award to be excessive in light of a settlement by a joint tortfeasor or another party legally responsible for the payment of damages, it is important to appreciate what the settlement represents. We have explained that a settlement "does not necessarily represent a claimant's fair, just and reasonable damages but, rather, represents, in part, the parties' assessments of the risks of litigation." (Internal quotation marks omitted.) *Caverly* v. *State*, supra, 342 Conn. 237. "[I]t does not equate to a satisfaction of a judgment represent[ing] full compensation for injuries"; (internal quotation marks omitted) id.; and cannot have any preclusive effect on a subsequent action. *Black* v. *Goodwin, Loomis & Britton, Inc.*, 239 Conn. 144, 168, 681 A.2d 293 (1996); cf. *Gionfriddo* v. *Gartenhaus Cafe*, 211 Conn. 67, 69, 75, 557 A.2d 540 (1989) (concluding that rule against double recovery precluded plaintiff from prevailing in dram shop action when there was no question that damages claimed in that action were "identical" to those awarded and recovered in earlier judgment rendered against tortfeasors, which were in excess of $1 million, and there was "no doubt that the plaintiff recovered 'just damages' ").

Of particular relevance in the present case, the settlement may contemplate payment for damages that are not included, or available, in the subsequent action on

the matter. The dram shop settlement payments in the present case, for example, may have contemplated damages for PTSD, which were not included as part of the trial court's award, and, according to the state, were legally unavailable in this action. What portion, if any, of the settlement payments was dedicated to such damages, which the courts below deemed unavailable by law in a UM/UIM action, is entirely speculative. The plaintiffs' damages award cannot be deemed excessive as a matter of law under such circumstances. Cf. *Jones* v. *Kramer*, 267 Conn. 336, 350–51, 838 A.2d 170 (2004) (defendant was not entitled to reduction of damages for collateral sources when it was unclear whether jury award included medical bills and other benefits claimed as collateral sources).

The state fares no better with its argument that the dram shop settlement payments are a "collateral source" for which a reduction is appropriate. "[S]ettlements expressly have been excluded from the statutory definition of 'collateral sources' for purposes of civil actions, either in tort or in contract, in which a plaintiff seeks to recover damages for personal injuries. See General Statutes §§ 52-225a and 52-225b." (Footnote omitted.) *Bovat* v. *Waterbury*, supra, 258 Conn. 601–602. The state seeks to avoid this impediment by contending that its right to reduce its obligations by collateral sources is not limited by the collateral source definition in § 52-225b because its rights derive from its contract.[9] Even if we assume, for the sake of argument, that the document relied on by the state prescribes binding terms, there is no indication in that document that "collateral source," as used therein, has a different meaning from the statutory definition in effect for more than three decades.

Finally, we observe that a statute or regulation may provide for a reduction from specific sources in a UM/UIM action, including payments obtained by settlement. See, e.g., *Anastasia* v. *General Casualty Co. of Wisconsin*, 307 Conn. 706, 725, 59 A.3d 207 (2013) ("it expressly has been left to the [Insurance] [C]ommissioner to determine whether an alternative source of recovery available to the insured should be an applicable offset . . . and . . . a duly promulgated regulation has the force and effect of statute" (citation omitted; emphasis omitted; internal quotation marks omitted)). The Insurance Commissioner has, for example, provided for the reduction of UM/UIM limits by sums "paid or . . . payable under any workers' compensation law . . . ." Regs., Conn. State Agencies § 38a-334-6 (d) (1) (B). In *DelGreco*, this court concluded that Dram Shop Act payments do not fall within the exception, in the state agency regulations, for sums "paid by or on behalf of any person responsible for the injury" because a claim under that act does not require proof that the dram shop was responsible for the injury. (Emphasis omitted; internal quotation marks omitted.) *American Universal*

*Ins. Co.* v. *DelGreco*, supra, 205 Conn. 197–99; see also Regs., Conn. State Agencies § 38a-334-6 (d) (1) (A); cf. *Hartford Casualty Ins. Co.* v. *Farrish-LeDuc*, 275 Conn. 748, 757–61, 882 A.2d 44 (2005) (concluding that injured party's settlement payment from professional liability insurer of law firm for legal malpractice resulting in inability to pursue claim against tortfeasor constituted sums " 'paid by or on behalf of any person responsible for the injury' " that reduced UM/UIM limits); *Buell* v. *American Universal Ins. Co.*, 224 Conn. 766, 768, 774–75, 621 A.2d 262 (1993) (concluding that UM/UIM insurer's payment under policy issued to operator of vehicle that struck claimant's vehicle constituted "payment made by or on behalf of any person responsible for the injury" that reduced UM/UIM limits (internal quotation marks omitted)). Although this court later observed that cases decided after *DelGreco* did not strictly limit application of the regulation to "amounts received from other *automobile liability policies* of those responsible for the injury"; (emphasis added; internal quotation marks omitted) *American Universal Ins. Co.* v. *DelGreco*, supra, 197; we reiterated *DelGreco*'s rationale regarding the strict liability nature of a dram shop claim. See *Hartford Casualty Ins. Co.* v. *Farrish-LeDuc*, supra, 763–64. No other exception applies. See footnote 9 of this opinion. The Appellate Court therefore incorrectly concluded that the trial court should have reduced Connolly's award by the sums received in settlement of his dram shop claim.

The judgment of the Appellate Court is reversed in part and the case is remanded to that court with direction to affirm the judgment of the trial court as to Connolly; the judgment of the Appellate Court is affirmed in all other respects.

In this opinion the other justices concurred.

[1] The state had cross appealed from the trial court's judgment rendered in favor of Zdrojeski but subsequently abandoned its appeal as to him. See *Menard* v. *State*, 208 Conn. App. 303, 312 n.8, 333 n.17, 264 A.3d 1034 (2021). The Appellate Court therefore affirmed the judgment in favor of Zdrojeski in the amount of $29,963.03. See id. We refer to Menard and Connolly collectively as the plaintiffs and to the parties individually by name. We discuss the matter as it pertains to Zdrojeski only insofar as it sheds light on the issues raised by the plaintiffs.

[2] Menard also introduced the testimony of his wife and his supervising officer to describe changes in his conduct and demeanor following the accident.

[3] Section 38a-336 has been amended by the legislature since the incident in question. See Public Acts 2015, No. 15-118, § 69; Public Acts 2014, No. 14-71, § 1; Public Acts 2014, No. 14-20, § 1. These amendments have no bearing on the merits of this appeal. In the interest of simplicity, we refer to the current revision of the statute.

[4] The Dram Shop Act sets an aggregate cap of $250,000 in damages. See General Statutes § 30-102. It appears to be undisputed that Menard, Connolly, and Zdrojeski each received an equal one-third portion of that cap in settlement of their respective dram shop claims. For a breakdown of all sums recovered by the plaintiffs in connection with the collision, see *Menard* v. *State*, supra, 208 Conn. App. 310–11.

[5] The Appellate Court reversed the judgments in favor of both plaintiffs under the principle that the state is entitled to judgment in its favor when its insured's damages have been reduced to zero dollars. See *Menard* v. *State*, supra, 208 Conn. App. 340–41. Although the trial court had reduced

Menard's damages to zero dollars for payments from sources other than the dram shop settlement, it had rendered judgment in Menard's favor. Id., 312, 341. Accordingly, the Appellate Court reversed the judgments as to both plaintiffs and remanded the cases to the trial court with direction to render judgments for the state as to them. Id., 341. The Appellate Court affirmed the judgment as to Zdrojeski. Id.

[6] The state argues that this court should not reach the first certified issue because the trial court's rejection of Honen's PTSD diagnosis is independently dispositive of this appeal. It also argues that the plaintiffs abandoned their challenge to the trial court's rejection of their expert's PTSD diagnosis by neither raising that issue in their certified appeal nor asking this court to remand the cases to the Appellate Court to decide that issue should they prevail on the certified issues in their main brief. As a consequence, the state contends that this court is without jurisdiction over the first certified issue because we cannot afford practical relief to the plaintiffs with respect to their PTSD claims in any event. We disagree. The plaintiffs could have sought permission to seek certification on an issue that the Appellate Court did not reach on grounds of judicial economy. See, e.g., *State* v. *McClain*, 324 Conn. 802, 804 n.1, 155 A.3d 209 (2017) (granting defendant's motion to modify certified issue to include issue that Appellate Court did not reach in interests of judicial economy to avoid remand to Appellate Court on single issue); see also, e.g., *Mueller* v. *Tepler*, 312 Conn. 631, 635 n.3, 646 n.14, 95 A.3d 1011 (2014) (addressing issue that was not decided by Appellate Court because issue had been briefed and was likely to arise on remand to trial court); *Stamford Hospital* v. *Vega*, 236 Conn. 646, 648 n.1 and 656, 674 A.2d 821 (1996) (revising certified questions to include issues that Appellate Court did not reach after this court sua sponte directed parties to brief those issues). Even though the plaintiffs have not done so, we conclude that it is appropriate for us to address the merits of the state's alternative ground for affirmance. It is apparent from the plaintiffs' request for relief in their main brief that they overlooked this unresolved issue rather than consciously abandoned it. They fully briefed the issue in their reply brief, as did the state in its responsive brief. Our decision not to reach the first certified issue should not be construed as taking any position on the Appellate Court's interpretation of § 38a-336.

[7] The trial court made no credibility assessment regarding the plaintiffs' own testimony recounting their past and present symptoms. Nevertheless, it is fair to infer from its rejection of Honen's diagnosis that the court may have had reservations about that testimony.

[8] The state's counsel referred obliquely to pending litigation, and it is unclear whether Honen's notes referring to litigation refer to the present action and/or other actions relating to the same incident. See *Zdrojeski* v. *Combs*, Superior Court, judicial district of Hartford, Docket No. CV-14-6053975-S.

[9] The state points to a 2012 memo, which is available as a public record but was not distributed to employees, in which it summarized the coverage it provides. The memo provides that the state "reserves the right to limit its liability pursuant to [§ 38a-334-6 (d) of] the Regulations of Connecticut State Agencies . . . by reducing the limits of its UM/UIM coverage by all sums (A) paid by or on behalf of any person responsible for the injury, (B) paid or payable under any workers' compensation law, or (C) paid under the policy in settlement of a liability claim *and to apply such payments, and any collateral source benefits payable to the claimant, the claimant's estate or beneficiaries, as a credit against amounts payable to the claimant under this coverage.*" (Emphasis added.) The regulation cited mirrors the language in the memo that identifies the three sources for reducing coverage limits but does not include the emphasized text. See Regs., Conn. State Agencies § 38a-334-6 (d) (1).